PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1963
_____

TREASURER OF THE STATE OF NEW JERSEY;
TREASURER OF THE STATE OF NORTH CAROLINA;
DIRECTOR OF THE DEPARTMENT OF REVENUE OF
THE STATE OF MONTANA; TREASURER OF THE
STATE OF KENTUCKY; TREASURER OF THE STATE
OF OKLAHOMA; ATTORNEY GENERAL OF THE
STATE OF MISSOURI; TREASURER OF THE STATE OF
PENNSYLVANIA

v.

UNITED STATES DEPARTMENT OF THE TREASURY;
SECRETARY OF THE UNITED STATES TREASURY
DEPARTMENT;
BUREAU OF PUBLIC DEBT, a Division of the United
States Treasury Department; COMMISSIONER OF THE
BUREAU OF PUBLIC DEBT,

Treasurer of the State of New Jersey,
Director of the Department of Revenue
of the State of Montana,
Treasurer of the State of Kentucky,
Treasurer of the State of Oklahoma,

Attorney General of the State of
Missouri,
Treasurer of the State of Pennsylvania,

Appellants

(Pursuant to Fed. R. App. P. 43(c)(1))
_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 04-4368)
Honorable Mary L. Cooper, District Judge

_____


Argued April 11, 2012


BEFORE:  HARDIMAN, GREENAWAY, JR., and
GREENBERG, Circuit Judges

(Filed: June 27, 2012)
_____


Carter G. Phillips (argued)
Sidley Austin
1501 K Street, N.W.
Washington, DC 20005

Peter G. Angelos
M. Albert Figinski
Law Offices of Peter G. Angelos

2

100 North Charles Street
One Charles Center, 22nd Floor
Baltimore, MD 21201

Randall K. Berger
Joanne M. Cicala
Roger W. Kirby
Kirby McInerney
825 Third Avenue
16th Floor
New York, NY 10022

William C. Cagney
Robert J. Luddy
Windels, Marx, Lane & Mittendorf
120 Albany Street Plaza, 6th Floor
New Brunswick, NJ 08901

William H. Murphy, Jr.
Andrew J. Toland
The Murphy Firm
1 South Street, 23rd Floor
Baltimore, MD 21202

Ernest A. Young
203 Strolling Way
Durham, NC 27707

Jeremiah J. Morgan, Sr.
Joel A. Poole
Office of Attorney General of Missouri

P.O. Box 899
Jefferson City, MO 65101

Gita F. Rothschild
McCarter & English
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102-06552

    Attorneys for Appellants

Alisa B. Klein (argued)
Mark B. Stern
United States Department of Justice, Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

David E. Dauenheimer
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

    Attorneys for Appellees

_____

OPINION OF THE COURT
_____

GREENBERG, Circuit Judge.

## I.      INTRODUCTION

4

In this action seven plaintiff States ("the States") sought to recover proceeds of matured but unredeemed United States savings bonds from the United States Treasury ("the Treasury").[1] In addition to the Treasury, the States also named other United States Government entities and officials in their official capacities as defendants and we refer to all the defendants collectively as the "Government" or "Federal Government." The States asserted that the Treasury has possession of approximately $16 billion worth of matured but unredeemed savings bonds, of which persons whose last known addresses were within the plaintiff States own $1.6 billion. The States contended that their respective unclaimed property acts obliged the Treasury to account for and deliver the proceeds of these bonds to the States for reunification with their owners. The Government moved to dismiss the case and the District Court granted its motion as it concluded that the Government's sovereign immunity and intergovernmental immunity barred the action and that federal law and regulations preempted the States' statutory authority to obtain the proceeds of the savings bonds. Six of the States appealed. Though we do not agree with the District Court with respect to the application of sovereign immunity, we do agree with its other conclusions and therefore we will affirm.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    The United States Savings Bond Program

---

[1] Throughout this opinion we refer to the plaintiffs in this action as "States" but to the 50 states as a whole as "states."

Pursuant to its constitutional power "to borrow money on the credit of the United States," Free v. Bland, 369 U.S. 663, 666-67, 82 S.Ct. 1089, 1092 (1962) (citing U.S. Const. art. I, § 8, cl. 2), Congress delegated authority to the Secretary of the Treasury ("the Secretary"), with the approval of the President, to issue savings bonds "for expenditures authorized by law." 31 U.S.C. § 3105(a).[2] The Government sold savings bonds, originally called liberty bonds, "[t]o obtain money for the United States Government . . . [and] to encourage thrift and savings by small investors." Moore's Adm'r v. Marshall, 196 S.W.2d 369, 372 (Ky. 1946). A United States savings bond is a contract between the United States and the bond's owner. Rotman v. United States, 31 Fed. Cl. 724, 725 (Fed. Cl. 1994). The Secretary may establish the terms and conditions that govern the savings bond program, a power that includes the authority to fix the bonds' investment yield, to promulgate terms and conditions providing that bondholders may keep the bonds beyond the date of their maturity, and to place conditions on transfer and redemption of the bonds and their sales prices. 31 U.S.C. § 3105(b)-(c). Most of the bonds that are the subject matter of this case are Series E bonds issued between 1941 and 1980. The Government sold the Series E bonds at a discount and paid interest on them only at maturity; according to the States, after maturity interest stopped accruing on the bonds.[3] The last Series

[2] This statute previously was codified at 31 U.S.C. § 757c(a). See Free, 369 U.S. at 666-67, 82 S.Ct. at 1092.

[3] The plaintiff States' representation that interest ceased to accrue on Series E bonds after maturity may be somewhat misleading but we will accept it in adjudicating this appeal. The reason we think that this representation may be misleading is

6

E bonds matured in 2011.

Pursuant to his statutory authority, the Secretary has promulgated various regulations governing the savings bond program that the Supreme Court has held preempt conflicting state law. See United States v. Chandler, 410 U.S. 257, 262, 93 S.Ct. 880, 883 (1973) (citing Free 369 U.S. at 668, 82 S.Ct. at 1093) ("[A]bsent fraud, the regulations creating a right of survivorship in United States Savings Bonds . . . pre-empt[] any inconsistent state property law."). In contrast to many other types of securities, "[s]avings bonds are not transferable and are

that 31 U.S.C. § 3105(b)(2)(A) indicates that the Secretary may prescribe regulations that provide for savings bonds to continue to earn interest during "a period beyond maturity." Moreover, 31 C.F.R. § 315.30 provides that "[a]ll Series E bonds and savings notes have been extended and continue to earn interest until their final maturity dates, unless redeemed earlier." The regulations allow for such an "extended maturity period," a "period after the original maturity date during which the owner may retain a bond and continue to earn interest on the maturity value" of the bond. 31 C.F.R. § 315.2(c). We see little difference between a bond paying interest accrued beyond maturity and extending a bond's maturity date for a period during which the bond earns interest. Indeed, it appears that when this action was commenced in 2004 some Series E bonds had passed their original maturity dates but were continuing to earn interest as their maturity dates had been extended. See 31 C.F.R. § 316.8. Obviously, if interest runs after the bonds' original maturity dates, the States' case, if affected at all, only could be weaker.

7

payable only to the owners named on the bonds, except as specifically provided in [the federal] regulations and then only in the manner and to the extent so provided." 31 C.F.R. §§ 315.15, 353.15.

There are limited exceptions to the general rule precluding the transfer of savings bonds, including cases in which a third party attains an interest in a bond through valid judicial proceedings. 31 C.F.R. §§ 315.20(b), 353.20(b).[4] As

---

[4] 31 C.F.R. § 315.39(a) and (b) provide for payment of series A, B, C, D, E, F, G, H, J, and K bonds, and 31 C.F.R. § 353.39(a) provides for payment of series EE bonds. The regulations contain identical language:

> The Department of the Treasury will recognize a claim against an owner of a savings bond and conflicting claims of ownership of, or interest in, a bond between coowners or between the registered owner and the beneficiary, if established by valid, judicial proceedings, but only as specifically provided in this Subpart. Section 315.23 [or section 353.23] specifies the evidence required to establish the validity of the judicial proceedings.

31 C.F.R. §§ 315.20(b), 353.20(b). 31 C.F.R. § 315.23 requires "that certified copies of the final judgment, decree, or court order, and of any necessary supplementary proceedings," be submitted to establish the validity of judicial proceedings, and also makes provisions for payment to certain bankruptcy trustees

8

will be seen below, it is highly significant that the regulations do not impose any time limits for bond owners to redeem the savings bonds, at least with respect to the bonds that are the subject matter of this case. Consequently, their owners can present them for payment to an authorized agent of the United States at any time. See 31 U.S.C. § 3105(b)(2)(A) (authorizing the Secretary to promulgate regulations providing that "owners of savings bonds may keep the bonds after maturity"). Though it might be thought unlikely that an owner would present a long-matured savings bond for redemption, the record shows that the Treasury as of 1989 was receiving claims of $7,000 to $10,000 a day for payment on savings bonds that had matured many years earlier. App. at 169.[5] As relevant here, a registered owner of a bond is presumed conclusively to be its owner absent errors in registration. 31 C.F.R. §§ 315.5, 353.5.

The redemption process is not complex, as the owner of a bond seeking to redeem it need only present the bond to an authorized payment agent for redemption, 31 C.F.R. §§ 315.39(a), 353.39(a), establish his identity, sign the request for payment, and provide his address. The agent then may pay the bond with a check drawn against funds of the United States.

and receivers.

[5] We note that the States in their complaint assert that "[n]ot surprisingly, Treasury has not been approached by owners in significant numbers seeking long-matured savings bonds." We cannot reconcile this allegation with the evidence in the record to which we have referred.

See 31 C.F.R. §§ 315.38, 353.38. Payment agents, ordinarily banks, are financial institutions qualified under Treasury regulations to pay sums due on savings bonds. See 31 C.F.R. §§ 315.2(j), 353.2(f). The relevant statutes and regulations do not contain provisions for locating owners of matured but unredeemed bonds. In 2000, the Treasury, however, created a "Treasury Hunt" Internet website, which provides information on matured but unredeemed Series E bonds issued after 1974 in a database searchable by Social Security Number.[6]

B.      The States' Unclaimed Property Acts

All of the plaintiff States have enacted unclaimed property acts, most of which they have based on some version of the Uniform Unclaimed Property Act, which is rooted in the common-law doctrine of escheat. See Conn. Mut. Life Ins. Co. v. Moore, 333 U.S. 541, 547, 68 S.Ct. 682, 686 (1948) ("The right of appropriation by the state of abandoned property has existed for centuries in the common law."). The plaintiff-appellant States of New Jersey, Kentucky, Montana, Oklahoma, Missouri and Pennsylvania claim that the unclaimed bonds are property of their residents within the meaning of their respective unclaimed property acts. See New Jersey Uniform Unclaimed Property Act, N.J. Stat. Ann. § 46:30B-1 et seq. (West 2003); Kentucky statutes regarding descent, wills and the administration of decedents' estates, Ky. Rev. Stat. Ann. §

---

[6]   The website is available at Treasury Hunt, http://www.treasurydirect.gov/indiv/tools/tools_treasuryhunt.htm.

10

393.010 et seq. (West 2012); Montana Uniform Unclaimed Property Act, Mont. Code Ann. § 70-9-801 et seq. (2012); Oklahoma Uniform Unclaimed Property Act, Okla. Stat. tit. 60, § 651 et seq. (2012); Missouri Uniform Disposition of Unclaimed Property Act, Mo. Ann. Stat. §§ 447.500 et seq. (West 2012); Pennsylvania statutes regarding disposition of abandoned and unclaimed Property, 72 Pa. Stat. Ann. § 1301.9 et seq. (West 1995). The States' unclaimed property acts require that, after time periods that differ from State to State, holders of unclaimed property turn the property over to the State for safekeeping though the original property owner retains the right to recover the proceeds of the property. See, e.g., N.J. Stat. Ann. § 46:30B-7 ("Except as otherwise provided by this chapter, all property . . . that is held . . . and has remained unclaimed by the owner for more than three years after it became payable or distributable is presumed abandoned.").

The unclaimed property acts at issue in this case are "custody" escheat statutes rather than "title" escheat statutes in that under them the State does not take title to abandoned property, but, instead, obtains its custody and beneficial use pending identification of the property owner.[7] Thus "[t]he

_____

[7] According to the plaintiff States, "statutes that transfer title [are] an obsolescent form of escheat no longer in force in any state." Appellants' br. at 3. We have some question as to whether this statement may be overbroad as it is difficult to understand how there can be an escheat of real or tangible personal property without a transfer of title, inasmuch as a state to dispose of such property ordinarily would need to sell it to a purchaser who would want title to the property. We, however,

11

presumption of abandonment raised by the statute is rebuttable at any time." John V. Orth, Escheat: Is the State the Last Heir?, 13 Green Bag 2d 73, 82 (2009). Although "[t]he practical reason behind the states' action is to prevent unclaimed personal property being eventually appropriated by the present holder," the state being "better able to provide long-term . . . custody" of the property, "it is sometimes admitted that the statutes are also a means of raising revenue." Id. at 78 (citing, e.g., Louisiana Health Serv. & Indem. Co. v. McNamara, 561 So. 2d 712, 716 (La. 1990)) ("Although one purpose of such acts is to protect the missing owners, the primary rationale behind this legislation is its use as a revenue raising device."); see, e.g., Clymer v. Summit Bancorp., 792 A.2d 396, 400 (N.J. 2002) (noting that 75% of the funds that New Jersey collects under its Uniform Unclaimed Property Act are transferred to the General State Fund, and the State "has full use" of the money "until the rightful owner comes forward to claim it"). Accordingly,

---

consider that an inquiry into the accuracy of the States' representation would be beyond the scope of this opinion and so do not make it. We recently described the New Jersey Unclaimed Property Act in American Express Travel Related Services, Inc. v. Sidamon-Eristoff, 669 F.3d 359 (3d Cir. 2012), in which we upheld a New Jersey statute that reduced the period after which travelers checks are presumed abandoned from 15 years to three years. Id. at 364. We indicated that after a transfer of abandoned property to the State of New Jersey it holds the property for the benefit of its owner in perpetuity. Id. at 365. Though American Express is an informative case with respect to the New Jersey act it does not address issues similar to those here.

12

though the States contend that their intent in bringing this action has been benevolent, the objective reality obviously is otherwise. The truth is that this case is a dispute between the States and the United States as to whether a State or the United States will obtain the benefit of having custody of and availability for use of the proceeds of the matured but unredeemed bonds even if it does not obtain title to the proceeds of the bonds or title to the bonds themselves.

The unclaimed property acts contain specific provisions for presuming property to be "abandoned" when the United States either holds the property or is obligated to make payment for it to its owner. See N.J. Stat. Ann. § 46:30B-41.2 (presuming property to be abandoned if unclaimed for more than one year after it became payable by "the executive, legislative, or judicial branch of the United States Government"); Okla. Stat. tit. 60, § 657 (property held by a state or other government presumed abandoned after being unclaimed for one year); Ky. Rev. Stat. Ann. § 393.068(1) (property held by Federal Government presumed abandoned if it remains unclaimed for more than five years); Mo. Rev. Stat. § 447.532(2) (property held by any agency or department of the United States deemed abandoned if unclaimed for more than three years); Mont. Code Ann. § 70-9-803(1)(k) (property held by a government or governmental subdivision unclaimed one year after it becomes distributable presumed abandoned); 72 Pa. Stat. Ann. § 1301.9 (any property held for its owner by any "instrumentality of the United States" unclaimed for five years from the date it first became demandable or distributable presumed abandoned).

C. The States' Efforts to Claim Proceeds of Matured

13

but Unredeemed Savings Bonds

Over the last several decades, various states have sought to recover the proceeds from matured but unredeemed savings bonds.  On February 27, 1952, the Treasury issued a bulletin reprinting a letter dated January 28, 1952, from the Secretary to the Comptroller of the State of New York in response to the Comptroller's inquiry regarding "the prospective right of the state of New York . . . to receive payment of certain United States securities of which it is not the registered owner."  App. at 134.  The Secretary explained that the Federal Government would pay the proceeds of savings bonds to the State of New York if it actually obtained title to the bonds, but would not do so where the State merely obtained a right to the custody of the proceeds.  The Secretary made this distinction because he believed that the effect of applying a custody-based escheat statute to savings bonds would

> either provide the obligor with a discharge, valid within and without New York, or fail to provide such discharge.  If the discharge is provided in the case of the ordinary debtor, then the other party to the contract has substituted for his right to pursue his obligor in any jurisdiction, a right merely to prosecute a claim against the State Comptroller of New York; if an effective discharge is not provided, the obligor is subject to suit outside the State of New York and the necessity of making double payment — in exchange he has a right to claim relief from the Comptroller under . . . [New York's] Abandoned Property Law.

14

Id. at 135. The Secretary concluded that "[n]either of these possible alterations of [the] contract [created by the savings bond] is contemplated in the agreement by which the United States pledges its faith on its securities," because "the rights and duties of the United States are governed by federal rather than local law." Id. at 135-36.

To the best of our knowledge the Treasury last articulated its position with respect to the application of state escheat laws on savings bonds or their proceeds in 2000 on its Internet website, "EE/E Savings Bonds FAQs" (frequently asked questions). In particular, the Treasury posted an answer to the question: "In a state that has a permanent escheatment law, can the state claim the money represented by securities that the state has in its possession. For example, can a state cash savings bonds that it's gotten from abandoned safe deposit boxes?" The plaintiff States refer to the Treasury's answer to this question — which is consistent with the bulletin that the Treasury issued almost one half of a century earlier and that we have quoted — as the "Escheat Decision." The Escheat Decision answered that:

> The Department of the Treasury will recognize claims by States for payment of United States securities where the States have succeeded to the title and ownership of the securities pursuant to valid escheat proceedings. The Department, however, does not recognize claims for payment by a State acting merely as custodian of unclaimed or abandoned securities and not as successor in title and ownership of the securities.

15

In other words, the Treasury recognizes escheat statutes that provide that a State has succeeded to the legal ownership of securities because in such case payment of the securities results in full discharge of the Treasury's obligation and this discharge is valid in all jurisdictions.

But, payment of securities to a State claiming only as a custodian results in the substitution of one obligor, the Department of the Treasury, for another, the State. Not only is there serious question whether there is authority for a State to effect such a substitution, but also there seems to be no basis for believing that payment to a State custodian would discharge Treasury of its obligation. Even if the discharge were claimed effective in the State to which the payment is made, it is believed that the Treasury's obligation and liability would still remain in force in all other jurisdictions.[8]

In the District Court, the parties stipulated that the Escheat Decision "is defendants' interpretation of federal savings bond

---

[8] The Escheat Decision took this statement nearly verbatim from a 1983 letter from the Treasury to the State of Kentucky. See app. at 139. The Escheat Decision is available at http://www.treasurydirect.gov/indiv/research/indepth/ebonds/res _e_bonds_eefaq.htm.

16

regulations . . . and reflects defendants' understanding of existing laws" and that "the Department has no intention of deviating from the statement." Id. at 142. The Treasury, however, has not adopted the Escheat Decision as a rule in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

### D. Procedural History

The Treasurer of the State of New Jersey filed this action on September 8, 2004, against the Treasury, the Secretary, the Bureau of Public Debt,[9] and the Commissioner of the Bureau of Public Debt under the New Jersey Uniform Unclaimed Property Act. The Treasurer of the State of North Carolina joined the action shortly thereafter.[10] The plaintiff States sought an order directing the Government to pay the proceeds of matured but unredeemed savings bonds to the plaintiff States according to the last known addresses of their owners and for an accounting of the amounts owed pursuant to their unclaimed property acts. It was and remains clear that if the unclaimed property acts are applied as written, by their terms they would entitle the States to substantially the relief that they seek in this action. Nevertheless, on February 5, 2005, the Government moved to dismiss or transfer the action to the United States Court of Federal Claims as it contended that only that court had subject

---

[9] The Bureau of Public Debt is the division of the Treasury responsible for administrating the savings bond program.

[10] North Carolina has not joined in this appeal. See app. at 1 (notice of appeal).

17

matter jurisdiction.  In making this motion the Government contended that the only applicable waiver of sovereign immunity that would permit this action to proceed was within the Tucker Act, which grants the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The District Court agreed with the Government with respect to the court that should entertain the action as it transferred the case to the Court of Federal Claims in July of 2005 pursuant to 28 U.S.C. § 1631 as it held that the States' claims were "based on contracts" — the savings bonds.  The States appealed from the order for transfer to the United States Court of Appeals for the Federal Circuit, the court with jurisdiction to entertain appeals from the Court of Federal Claims as the transferee court, rather than to this Court.  See Carteret Sav. Bank v. Shushan, 919 F.2d 225, 228 (3d Cir. 1990).

On June 15, 2006, the Court of Appeals for the Federal Circuit held that the Court of Federal Claims lacked jurisdiction over this case and the court of appeals accordingly remanded the case to the District Court for further proceedings.  See McCormac v. U.S. Dep't of Treasury, 185 F. App'x 954 (Fed. Cir. 2006).  In briefs filed in the court of appeals, the United States acknowledged that it had erred in requesting the transfer and conceded that the case was not within the limited jurisdiction of the Court of Federal Claims.  The court of appeals wrote that the Court of Federal Claims did not have

18

jurisdiction because the States "do not assert a contractual relationship . . . that provides a substantive right to money damages." Id. at 955. Accordingly, "although the States [were] asserting a claim that involves a contract, they [were] not asserting a contract claim for money damages against the government." Id. at 956. Moreover "[t]he States [were] not named parties to the bond contract, [and thus there was not] privity between the States and the Government." Id. The court of appeals noted that the States, by operation of their unclaimed property acts, sought to act only as conservators, not as parties to any contracts. Id.

After the return of the case to the District Court the plaintiff States amended their complaint multiple times to add as plaintiffs officials of the States of Montana, Kentucky, Oklahoma, Missouri, and Pennsylvania, and to add claims that the Escheat Decision violated the Tenth Amendment[11] and the notice and comment provisions of the APA contained in 5 U.S.C. § 553.[12] In November of 2008, the Government filed a

---

[11] The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

[12] 5 U.S.C. § 553 provides in relevant part:

19

motion to dismiss the fourth amended complaint, again contending that the District Court did not have jurisdiction but this time predicating that contention on an argument that the

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. . . .

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. . . .

20

United States had not waived sovereign immunity and thus the Federal Government could not be made a defendant in this action. The Government, however, did not contend that even if it did not enjoy sovereign immunity in this case the Court still would not have statutory jurisdiction under 28 U.S.C. § 1331 or any other statute. In the alternative, the Government sought summary judgment on the grounds of intergovernmental immunity and federal preemption of the States' unclaimed property acts.

After oral argument, the District Court denied the Government's motion without prejudice, but granted it leave to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b). In July of 2009, the Government filed the ultimately successful motion to dismiss and obtained the order that the States challenge on this appeal.[13] The Government argued that dismissal for lack of jurisdiction was warranted under Rule 12(b)(1) because the States had not established that the Government had waived sovereign immunity. Alternatively, the Government argued that dismissal was appropriate under Rule 12(b)(6) because federal law preempted the States'

---

[13] The Government addressed its motion to dismiss to the fourth amended complaint but after oral argument on the motion the States sought leave to amend the complaint to add the Treasurer of Pennsylvania as a plaintiff. The Government consented to the amendment, thus generating a fifth amended complaint. Because the fifth amended complaint was substantially the same as the fourth amended complaint, the District Court's opinion referenced the fourth amended complaint.

unclaimed property acts to the extent that the States sought to apply those acts in this case. The Government also contended that the doctrine of intergovernmental immunity barred the States' case and the case lacked merit insofar as the States based their claims on the Tenth Amendment and violations of the APA's notice and comment provisions.

The District Court began its analysis with the Government's arguments on the merits under Rule 12(b)(6) even though "Article III [of the Constitution] generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case."[14] Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583, 119 S.Ct. 1563, 1569 (1999). The District Court first addressed the issue of intergovernmental immunity, and concluded that the imposition of the States' escheat acts impermissibly would regulate the Federal Government by imposing potential civil and criminal penalties on the Government for failure to comply with the acts'

---

[14] In Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 118 S.Ct. 1003 (1998), the Supreme Court disapproved of the practice that some courts of appeals, including this Court, had adopted of assuming "hypothetical jurisdiction" when facing difficult jurisdictional questions in situations in which the party entitled to prevail on the merits would be the same party prevailing if the court did not have jurisdiction. Id. at 93-94, 118 S.Ct. at 1012. Under the rule of Steel Co., when a court lacks jurisdiction its "only function . . . is that of announcing the fact and dismissing the cause" as any further discussion would amount to an "advisory opinion." Id. at 94, 101, 118 S.Ct. at 1012, 1016.

22

record-keeping and reporting requirements, and would interfere with Congress's constitutional power, U.S. Const. art. IV, § 3, cl. 2, to "dispose of and make all needful Rules and Regulations respecting the . . . Property belonging to the United States." App. at 28-30. The Court also observed that implementing the laws "could result in multiple obligations on the same bond by the United States," id. at 30, because the respective States would be substituted as obligors on the bonds, while the Federal Government would remain contractually and statutorily obligated on the bonds to the original bondholder or his legal successors.

Next, addressing preemption, the District Court held that the States' proposal for taking custody of the bonds pursuant to their escheat laws impermissibly would interfere with the contract between the bondholders and the United States, thus conflicting "with the narrow regulations governing redemption of the bonds." Id. at 30-31. The Court also rejected the States' Tenth Amendment reserved power claim that they had the right to enforce their unclaimed property acts to gain custody of the proceeds of the savings bonds. In this regard, the Court held because the States' acts had been preempted, Congress had not infringed the States' reserved powers by exercising powers not delegated to the United States. Finally, the Court held that the States' notice and comment claim failed because the Escheat Decision concerns government contracts and thus the Decision explicitly was exempt from the requirements of 5 U.S.C. §

23

553.[15] See 5 U.S.C. § 553(a) (stating that "[t]his section applies . . . except to the extent there is involved . . . a matter relating to agency . . . contracts"). Alternatively, with respect to the States' notice and comment claim the Court held that the Escheat Decision was an "interpretive rule" or "general statement[] of policy" not subject to the statute's requirements. See 5 U.S.C. § 553(b)(A) (stating with exceptions not relevant here that the APA's notice provision does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice").

---

[15] On this appeal, the States essentially do not challenge the District Court's ruling rejecting their 5 U.S.C. § 553 notice and comment argument, and therefore they have waived their right to contend that the Court erred in making that ruling. See FDIC v. Deglau, 207 F.3d 153, 169 (3d Cir. 2000). They indicate, however, in their brief that they contingently "do assert a claim under the APA concerning Treasury's failure to promulgate its Escheat Decision through notice and comment rulemaking or to publish it in the Federal Register . . . but [do so] simply to forestall any assertion by defendants that the Escheat Decision is agency action that preempts the States' cause of action under their escheat statutes." Appellants' br. at 17 n.5. The Government, however, does not make that contention as it argues that federal constitutional provisions, laws, and duly adopted regulations preempt the States' unclaimed property acts. Obviously, the Escheat Decision has no preemptive effect as it merely is the Treasury's opinion as to the effect of those primary sources of law.

24

When it addressed the sovereign immunity and jurisdictional issues, the District Court concluded that the Escheat Decision and the Government's refusal to turn over the unclaimed bonds did not constitute "final agency action" subject to judicial review. See 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").[16] On February 5, 2010, the Court entered an order dismissing this action. This appeal followed.

III.    JURISDICTION AND STANDARD OF REVIEW

The question of whether the District Court had jurisdiction is at issue in this appeal. Accordingly, we will address its jurisdiction in our discussion below. We have appellate jurisdiction under 28 U.S.C. § 1291.

Our review of the dismissal in this case involving a facial challenge to the District Court's jurisdiction is plenary. In re

---

[16] The District Court did not specify whether it based its decision to dismiss the case on the merits pursuant to Rule 12(b)(6) or on its lack of jurisdiction under Rule 12(b)(1). As we discuss below, regardless of the District Court's intent we affirm its dismissal on the basis of Rule 12(b)(6) as we are satisfied that it had jurisdiction.

25

Kaiser Grp. Int'l Inc., 399 F.3d 558, 561 (3d Cir. 2005). Thus, in our jurisdictional determination we "accept all [the] well-pleaded allegations in the complaint as true and view them in the light most favorable to the [States]." Id.

We exercise plenary review of the District Court's order granting the Government's motion to dismiss under Rule 12(b)(6) for failure to state a claim. See Allen ex rel. Martin v. LaSalle Bank, N.A., 629 F.3d 364, 367 (3d Cir. 2011). Similarly, as in our jurisdictional review, in reviewing the dismissal under Rule 12(b)(6), "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the [States]." Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). A court may grant a motion to dismiss under Rule 12(b)(6) "only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, [it] finds that [a] plaintiff's claims lack facial plausibility." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 1964-65 (2007)).

## IV.     DISCUSSION

### A.     Subject Matter Jurisdiction

Without a waiver of sovereign immunity, a court is without subject matter jurisdiction over claims against federal agencies or officials in their official capacities. United States v.

26

Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351 (1980) ("The United States, as sovereign, is immune from suit save as it consents to be sued.") (alteration and citation omitted). A waiver of sovereign immunity must be express and unambiguous to confer subject matter jurisdiction on a court. United States v. Bein, 214 F.3d 408, 412 (3d Cir. 2000). As the Supreme Court said in United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 514, 60 S.Ct. 653, 657 (1940), "[c]onsent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is void." Moreover, as the Court also has explained "a waiver of sovereign immunity must be strictly construed in favor of the sovereign," Orff v. United States, 545 U.S. 596, 601-02, 125 S.Ct. 2606, 2610 (2005), and "[t]he terms of [the] waiver define the extent of the court's jurisdiction." United States v. Mottaz, 476 U.S. 834, 841, 106 S.Ct. 2224, 2229 (1986) (citation omitted).

The States initially argue that the proposed application of their respective unclaimed property acts to the savings bonds or their proceeds does not implicate sovereign immunity because it does not create a context in which the Federal Defendants might be able to assert their sovereign immunity. The States predicate this argument on the circumstance that the United States does not assert an ownership interest in the proceeds of the unclaimed bonds or in the bonds themselves. We, however, conclude that this argument lacks merit. In rejecting the States' argument we note that we have observed, rather unsurprisingly, that "sovereign immunity is implicated" when "a plaintiff [is] suing the United States." Scheafnocker v. Comm'r, 642 F.3d 428, 433 n.8 (3d Cir. 2011) (citing Becton Dickinson and Co. v.

27

Wolckenhauer, 215 F.3d 340, 345 (3d Cir. 2000)); see S. Delta Water Agency v. U.S. Dep't of Interior, 767 F.2d 531, 536 (9th Cir. 1985) (noting that "[f]ederal agencies and instrumentalities, as well as federal employees acting in their official capacities within their authority are [also] immune from suit" absent a congressional waiver of sovereign immunity) (citation omitted).

The States next assert that even if sovereign immunity is implicated in this case, the APA provides for its waiver. We agree with the States' APA argument and thus hold that the District Court erred to the extent it relied on sovereign immunity to dismiss the case under Rule 12(b)(1). In considering sovereign immunity we initially observe that the APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." Franklin v. Massachusetts, 505 U.S. 788, 796, 112 S.Ct. 2767, 2773 (1992). Thus, the APA in 5 U.S.C. § 702 provides in relevant part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

The second sentence of the above portion of section 702 had its origin in the 1976 amendments to the APA by which Congress sought to "remove three technical barriers to the consideration on the merits of citizens' complaints against the Federal Government, its agencies, or employees." H.R. Rep. No. 94-1656, at 3 (1976), reprinted in 1976 U.S.C.C.A.N. 6121, 6123. A key "technical barrier" that Congress removed was "the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review." 5 U.S.C. § 702, Historical and Statutory Notes. The Supreme Court subsequently clarified that "it is undisputed that the 1976 amendment to § 702 was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment." Bowen v. Massachusetts, 487 U.S. 879, 891-92, 108 S.Ct. 2722, 2731 (1988). Thus, section 702 "provides both a waiver of sovereign immunity and a right of judicial review." NVE, Inc. v. Dep't of Health and Human Servs., 436 F.3d 182, 189 (3d Cir. 2006).

The States now contend that the District Court erred in holding that the scope of the waiver of sovereign immunity under section 702 is limited to "final agency action."[17] The

---

[17] The States took the position before the District Court that if a waiver of sovereign immunity was necessary, the Escheat Decision would have to have been "final agency action" for it to be reviewable under the APA. That contention is inconsistent with their position on this appeal. The States complain that the District Court "severely limited discovery to the issues of ripeness and whether Treasury's policy on escheat constituted

APA in 5 U.S.C. § 704 sets forth limitations on the type of agency actions reviewable under the APA, as it provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." See 5 U.S.C. § 551(13) ("'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). The District Court concluded that because the Escheat Decision was not reviewable by statute and was not a "final agency action," section 702 did not waive sovereign immunity in this case.

But the District Court's conclusion was at odds with opinions of several courts of appeals that have clarified that the waiver of sovereign immunity in section 702 extends to all non-monetary claims against federal agencies and their officers, regardless of whether or not the cases seek review of "agency action" or "final agency action" as set forth in section 704. For example, in Trudeau v. Federal Trade Commission, 456 F.3d 178, 187 (D.C. Cir. 2006), the United States Court of Appeals for the District of Columbia Circuit held that section 702's

_____

final agency action," Appellants' reply br. at 2, and assert that broader discovery would have been useful on the issues of "whether escheat of unclaimed bonds would interfere with the administration of the federal bond program, or subject Treasury to double liability, or confuse bondholders." Id. at 2-3. They, however, do not ask us to reverse because of the Court's limitation on discovery.

30

waiver of sovereign immunity "is not limited to APA cases" and applies "regardless of whether the elements of an APA cause of action are satisfied." In Trudeau, the Federal Trade Commission ("FTC") issued what the plaintiff alleged was a false and misleading press release about his business activities. The plaintiff asserted that the FTC violated his rights under the First Amendment and he was entitled to relief under 5 U.S.C. § 706, which provides that a reviewing court may set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations." Id. at 188. The district court dismissed the complaint for lack of subject matter jurisdiction because the press release was not "final agency action" under section 704. Id. at 182. The court of appeals in reversing held that even though the plaintiff's claims failed on the merits that circumstance made no difference for jurisdictional purposes because regardless of whether the FTC press release constituted a "final agency action" the District Court had jurisdiction. In reaching its conclusion, the court of appeals cited the Senate Report accompanying the 1976 APA amendments, which indicated that section 702's partial waiver of sovereign immunity extended to nonstatutory review[18] of federal administrative action, and thus included the plaintiff's claims even if he had not made them under the APA. Id. at 187 (citing S. Rep. No. 94-996, at 8 (1976) reprinted in 1976 U.S.C.C.A.N. 6121, 6129).

In its opinion the Trudeau court dealt with the first

_____

[18] Such lawsuits "are called 'nonstatutory' because they are not brought under the statutes that specially provide for review of agency action." Jaffee, 592 F.2d at 719 n.12.

31

sentence of section 702 which reads, "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof," but then emphasized that the statute's waiver of sovereign immunity was in the second sentence of section 702 which reads:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

Id. at 185. The court of appeals emphasized that while the second sentence refers to a claim against an "agency," and thus carries that limitation to the scope of the waiver of sovereign immunity, the sentence does not use the terms "agency action" or "final agency action." Furthermore, the court of appeals observed that the House and Senate Reports accompanying the 1976 amendments reflected Congress's intent to waive immunity for "any" and "all" actions for non-monetary relief against an agency. Id. at 187 (citing H.R. Rep. No. 94-1656, at 3, S. Rep. No. 94-996, at 8, reprinted in 1976 U.S.C.C.A.N. at 6129). In sum, the court of appeals held that section 704's "final agency action" requirement only limited the viability of claims made under the APA, and because section 702 operated as a waiver for all non-monetary claims, including those claims not made under

32

the APA, section 704 did not limit section 702's waiver of sovereign immunity.

The Court of Appeals for the Ninth Circuit recently agreed with Trudeau that section 702's waiver of sovereign immunity is not limited to actions brought under the APA. In Veterans for Common Sense v. Shinseki, 644 F.3d 845 (9th Cir. 2011), a veterans' group claimed that the Department of Veterans Affairs' dilatory processing of mental health claims violated the veterans' constitutional right to benefits. Id. at 860-61. In Veterans for Common Sense the district court held that the "final agency action" limitation in section 704 restricted the waiver of sovereign immunity in section 702, and inasmuch as the delays in processing claims did not constitute "final agency action," section 702 did not waive sovereign immunity. Id. at 863. The court of appeals reversed, concurring with Trudeau and holding that the first sentence of section 702 referred to a cause of action created by the APA, and not any jurisdictional limitation. Id. at 866 ("The first and second sentences of § 702 play quite different roles."). Therefore, the court of appeals held that section 702 waived sovereign immunity for purposes of the plaintiff's request for injunctive relief based on the Constitution, even if judicial review did not involve "agency action" under section 704.

The Veterans for Common Sense court relied on its earlier decision in Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518 (9th Cir. 1989), where the plaintiffs alleged that there had been First and Fourth Amendment violations when federal agencies secretly recorded church services. There, the court of appeals noted that while the original 1946 form of

33

section 702, which contained the first but not second sentence, may have limited judicial review to "agency action," the 1976 amendments, which added the second sentence, reflected an "unqualified waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable," and "[n]othing in the language of the amendment suggests that the waiver of sovereign immunity is limited to claims challenging conduct falling in the narrow definition of 'agency action.'" Id. at 525.

Other courts of appeals have taken the same position as the Trudeau and Veterans for Common Sense courts. In Delano Farms Co. v. California Table Grape Commission, 655 F.3d 1337, 1344 (Fed. Cir. 2011), the Court of Appeals for the Federal Circuit held that grape growers could maintain a patent claim against the United States Department of Agriculture for declaratory relief because section 702 applied broadly to waive sovereign immunity for all claims not seeking money damages. The Courts of Appeals for the Seventh and First Circuits have viewed the waiver of sovereign immunity in the second sentence of section 702 similarly. See Michigan v. U.S. Army Corps of Eng'rs, 667 F.3d 765, 775 (7th Cir. 2011) ("the conditions of § 704 affect the right of action contained in the first sentence of § 702, but they do not limit the waiver of immunity in § 702's second sentence") (citing Veterans for Common Sense, 644 F.3d at 866-68); Blagojevich v. Gates, 519 F.3d 370, 372 (7th Cir. 2008) (holding that section 702 waives immunity for a lawsuit by a state governor alleging that the Department of Defense violated a statute requiring the governor's approval before moving a national guard unit from the state); Puerto Rico v. United States, 490 F.3d 50, 57-58 (1st Cir. 2007) (holding that

34

section 702 encompasses all actions for specific relief against a federal agency or its officers).

Although we acknowledge that section 702 is not a model of clarity, our independent review of our precedents and the statute's legislative history leads us to agree with the position taken by the courts of appeals in the opinions to which we have referred. In Specter v. Garrett, 995 F.2d 404 (3d Cir. 1993), rev'd on other grounds sub nom. Dalton v. Specter, 511 U.S. 462, 114 S.Ct. 1719 (1994), we held that an action seeking an order enjoining the Secretary of the Navy from closing a naval shipyard could proceed under the Defense Base Closure and Realignment Act of 1990 despite the defendants' invocation of sovereign immunity, stating that "the waiver of sovereign immunity contained in § 702 is not limited to suits brought under the APA." Id. at 410. Although we did not address directly whether section 704 operates as a limitation on section 702's waiver of sovereign immunity, we recently clarified that the judicial review provisions of the APA such as section 704, are not jurisdictional, but rather "provide a limited cause of action for parties adversely affected by agency action." Chehazeh v. Attorney Gen. of the United States, 666 F.3d 118, 125 n.11 (3d Cir. 2012) (quoting Oryszak v. Sullivan, 576 F.3d 522, 525 (D.C. Cir. 2009)). "Thus, if agency action is . . . not final agency action, 5 U.S.C. § 704, a plaintiff who challenges such an action cannot state a claim under the APA . . . and the action must be dismissed." Id. (citing Oryszak, 576 F.3d at 525) (internal quotation marks omitted).

The House of Representatives Report accompanying the 1976 amendments confirms that Congress contemplated that the

amendments would implement a broad waiver of sovereign immunity. As stated above, prior to the amendments section 702 contained the first sentence, which provided that a person aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review, but it did not contain the second sentence. Thus, in 1976 when Congress added the second sentence it did so for the specific purpose of waiving sovereign immunity. See H.R. Rep. No. 94-1656, at 1, reprinted in 1976 U.S.C.C.A.N. at 6121. The House Report, however, explained that the second sentence of section 702, providing that a federal agency and its officers could be named as defendants in non-monetary actions, was subject to limitations. First, the amendment only waives sovereign immunity for actions in a federal court; second, such actions must seek non-monetary relief; and third, it is "applicable only to functions falling within the definition of 'agency' in 5 U.S.C. section 701." Id. at 11, reprinted in 1976 U.S.C.C.A.N. at 6131.

But the House Report does not state that there is a fourth limitation limiting the waiver of sovereign immunity in section 702 to suits challenging "agency action" as defined in the APA. Rather, the Report indicates that "[t]he amendment made to section 702 of title 5 would eliminate the defense of sovereign immunity in any action in a federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of that agency." Id. at 3, reprinted in 1976 U.S.C.C.A.N. at 6123 (emphasis added); see id. at 9, 1976 U.S.C.C.A.N. at 6129 ("[T]he time now [has] come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an

36

official capacity.") (emphasis added.). Accordingly, section 704 in limiting review to "final agency action" concerns whether a plaintiff has a cause of action under the APA that can survive a motion to dismiss under Rule 12(b)(6) but does not provide a basis for dismissal on grounds of sovereign immunity.[19] Here, of course, the States seek equitable relief and not monetary damages and accordingly, the Government's sovereign immunity from this action has been waived.[20]

---

[19] The Government contends that the waiver of sovereign immunity should be limited to actions brought under federal law rather than state law as the States have done here to the extent that they seek relief under their unclaimed property acts. Though in view of the circumstance that most cases against the Government are under federal law so that Congress probably was focused on that law when it adopted the 1976 amendments to the APA, we see no support for the distinction that the Government makes between federal and state law in either the text or the history of section 702.

[20] We emphasize here that although in this action the States seek to recover a very large sum of money, this action does not seek "money damages" within the meaning of section 702. In Bowen, 487 U.S. 879, 108 S.Ct. 2722, the State of Massachusetts sued the Secretary of Health and Human Services in order to enforce a provision of the Medicaid statute requiring that the Federal Government reimburse it for certain Medicaid expenditures that it had made. The Court held that section 702 waived sovereign immunity in that case even though Massachusetts sought to make a monetary recovery from the

Although the defense of sovereign immunity raises a claim constituting a jurisdictional limitation, even if, as we now hold here, the defense is unsuccessful, the court in which the plaintiff has brought the action cannot entertain the case unless it has jurisdiction under Article III of the Constitution and the statutes that Congress has adopted providing a federal court with jurisdiction over the case. Accordingly, as distinct from its arguments that the States' lawsuit does not fall within the APA's waiver of sovereign immunity, the Government now contends

Federal Government, observing that "[o]ur cases have long recognized the distinction between an action at law for damages — which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation — and an equitable action for specific relief — which may include an order providing for the reinstatement of an employee with backpay, or for 'the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions.' Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 688, 69 S.Ct. 1457, 1460 (1949) (emphasis added))." Id. at 893, 108 S.Ct. at 2732; see id. at 895, 108 S.Ct. at 2732 (explaining that "[d]amages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." (citation and internal quotation marks omitted)). Accordingly, the Court held that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" Id. at 893, 108 S.Ct. at 2732.

— even though it did not advance this point in the District Court — that the District Court lacked an independent basis for federal question jurisdiction because the States are making claims under state, not federal law. Thus, the Government contends that the District Court did not have jurisdiction over the States' action under 28 U.S.C. § 1331 or, indeed, under any other statute.[21] Although we sometimes have referred to the APA as conferring "jurisdiction," see, e.g., Pinho v. Gonzales, 432 F.3d 193, 200 (3d Cir. 2005), the Supreme Court has stated that "the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action." Califano v. Sanders, 430 U.S. 99, 107, 97 S.Ct. 980, 985 (1977). Accordingly, we have recognized that ordinarily "the 'federal question' statute, 28 U.S.C. § 1331, 'confer[s] jurisdiction on federal courts to review agency action.'" Chehazeh, 666 F.3d at 125 n.11 (quoting Califano, 430 U.S. at 105, 97 S.Ct. at 984). See Chrysler Corp. v. Brown, 441 U.S. 281, 317 n.47, 99 S.Ct. 1705, 1725 n.47 (1979) ("Jurisdiction to review agency action is found in 28 U.S.C. § 1331."); Jaffee v. United States, 592 F.2d 712, 718 (3d Cir. 1979) ("[S]ection 702, when it applies, waives sovereign immunity in 'nonstatutory' review of agency action under section 1331.") (emphasis added).

We thus must decide whether the States' claims arise

---

[21] Of course, inasmuch as we must assure ourselves that the District Court had subject matter jurisdiction the Government may assert this jurisdictional argument initially on this appeal. See Arizonans for Official English v. Arizona, 520 U.S. 43, 73, 117 S.Ct. 1055, 1071-72 (1997).

39

"under the Constitution, laws, or treaties of the United States," so that the District Court had jurisdiction pursuant to 28 U.S.C. § 1331, or whether the Court had jurisdiction pursuant to another statute.  See Trudeau, 456 F.3d at 185 ("[B]ecause the APA neither confers nor restricts jurisdiction, we must still determine whether some other statute provides it.").  See Alvarado v. Table Mountain Rancheria, 509 F.3d 1008, 1016 (9th Cir. 2007) ("To confer subject matter jurisdiction in an action against a sovereign, in addition to a waiver of sovereign immunity, there must be statutory authority vesting a district court with subject matter jurisdiction.").  In considering the federal jurisdiction question we recognize that it might be thought that inasmuch as the States are attempting to enforce their unclaimed property acts in this action, this case could not be within federal jurisdiction under 28 U.S.C. § 1331.

Even though the States have brought this action with the intent ultimately to obtain relief under their laws there is no escape from the fact that this case largely involves the Government's claim that federal statutes and regulations preempt the States' unclaimed property acts.  That circumstance compels us to consider the long established well-pleaded complaint rule to the end that "federal courts have federal question jurisdiction only when a federal claim appears in the complaint, and not when a federal preemption defense may eventually be raised in litigation." Levine v. United Healthcare Corp., 402 F.3d 156, 162 (3d Cir. 2005) (citation omitted).  Yet the States not unreasonably cite Grable & Sons Metal Products, Inc. v. Darue Engineering and Manufacturing, 545 U.S. 308, 125 S.Ct. 2363 (2005), as support for their contention that the District Court did have jurisdiction.  It is true that aspects of

40

Grable read in isolation seem to support the States' jurisdictional contention with respect to the preemption issues in this case for this case raises and, indeed, is about, in the words of Grable, "significant federal issues." Grable, 545 U.S. at 312, 125 S.Ct. at 2367. Moreover, the state law claims being advanced here under the States' unclaimed property acts, in the words of Supreme Court jurisprudence even before Grable, "depend[ ] upon the construction or application of [federal law]." Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 199, 41 S.Ct. 243, 245 (1921).[22] Furthermore, this case is a direct action against the Government and thus differs from the ordinary preemption case in which a private defendant relies on federal law as a defense to a state cause of action. See, e.g., PLIVA, Inc. v. Mensing, 131 S.Ct. 2557, 2577-78 (2011). Indeed, we cannot help but wonder whether the States could have cast this case as a declaratory judgment action seeking a declaration that a judgment obtained in a proceeding under their unclaimed property acts would be enforceable against the Federal Government with respect to the proceeds of matured but unredeemed savings bonds.[23]

---

[22] The dominance of federal law in this case is highlighted in the States' brief in which they correctly point out that the "United States does not dispute that the States' unclaimed property laws require unclaimed savings bonds to be turned over to state custody pending location of the absent owners. The question on the merits is thus whether federal law somehow preempts the operation of these escheat laws." Appellants' br. at 22.

[23] In this regard, we note that the Supreme Court indicated in

41

Grable, however, insofar as the States advance it as support for their jurisdictional contentions, has its limitations. In Grable a federal taxpayer brought an action to quiet title in a state court against a purchaser of the property who acquired the property by a quitclaim deed from the Government. The Government sold the property to the purchaser to satisfy the taxpayer's tax delinquency. In the quiet title action the taxpayer asserted that the purchaser's title was invalid because the Government did not follow proper procedure in giving required notice when seizing the property. The purchaser removed the case to a federal court claiming that there was federal question jurisdiction even though the plaintiff-taxpayer sought to quiet title to its property in a state court, a classic state law procedure, and even though there was no suggestion in the case that there was diversity of citizenship between the parties. The taxpayer moved to remand the case to state court but the district court denied the motion and the court of appeals affirmed. The Supreme Court granted certiorari and affirmed.

The Supreme Court held that there was federal question jurisdiction in Grable principally because of the dominance of

---

Bowen, 487 U.S. at 893, 108 S.Ct. at 2731, that the 1976 amendment referring to relief other than money damages "does not foreclose judicial review of the actions brought by the State challenging the Secretary's disallowance decisions." The Court first noted that "insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages." The Court went on to state that "even the monetary aspects of the relief that the State sought are not 'money damages' as that term is used in the law."

42

significant federal issues in that case. But as the Court of Appeals for the Ninth Circuit said in California Schock Trauma Air Rescue v. State Compensation Insurance Fund, 636 F.3d 538, 542 (9th Cir. 2011), "the Grable complaint did present a federal issue on its face" with respect to the Internal Revenue Service not following proper procedures in the seizure of the taxpayer's property. Therefore, the court of appeals understood Grable to uphold the assertion of federal jurisdiction because the complaint "satisfie[d] both the well-pleaded complaint rule and passe[d] the implicates significant federal issues test." Id. (internal quotation marks and brackets omitted). We also are aware that the Supreme Court itself in Empire Healthcare Assurance, Inc. v. McVeigh, 547 U.S. 677, 699, 126 S.Ct. 2121, 2136 (2006), emphasized the limitations of Grable when it indicated that Grable dealt with a "special and small category" of cases that qualify for federal question jurisdiction.

In the end, however, we do not find it necessary to decide whether the District Court had jurisdiction by reason of the presence of the preemption issue in this case. We bypass the preemption jurisdictional question because it is clear that the Court had jurisdiction in light of the States having advanced a significant Tenth Amendment claim in their complaint which seeks relief on the basis of the "Treasury's Escheat Decision [having] violate[d] the Tenth Amendment of the United States Constitution." App. at 109. In considering the effect of this claim with respect to federal jurisdiction we start from the unquestioned principle that jurisdiction lies under 28 U.S.C. § 1331 when a cause of action arises under federal law on the basis of the plaintiff having made a claim under the Tenth Amendment. As the court of appeals indicated in Bolden v. City

43

of Mobile, 571 F.2d 238, 247 (5th Cir. 1978), rev'd on other grounds, City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490 (1980):

> The abuse of local governmental power, when of the constitutional magnitude in this case, is a power denied the States by the Constitution within the meaning of the tenth amendment. The power to remedy the unconstitutional wrong is one delegated to the United States by the Constitution. The Constitution expressly provides for federal court jurisdiction in claims arising under this Constitution (or) Laws of the United States. U.S. Const. art. 3, § 2. Congress has given the federal courts original jurisdiction over such claims. 28 U.S.C. § 1331.

Id. (internal quotation marks omitted); see also Hodges v. Shalala, 121 F. Supp. 2d 854, 863-64 (D.S.C. 2000) (federal question jurisdiction exists under section 1331 in action in which state contends that Congress overstepped boundaries of the Tenth Amendment and the Spending Clause when it statutorily attached certain conditions to states' receipt of federal funding).

The Supreme Court at one time regarded the Tenth Amendment as little more than a tautology that could not support a cause of action:

> The amendment states but a truism that all is retained which has not been surrendered. There is

44

nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers.

United States v. Darby, 312 U.S. 100, 124, 61 S.Ct. 451, 462 (1941).

More recently, however, the Court has embraced the view that the states may invoke the Tenth Amendment as a basis for invalidating federal action. Most notably, in New York v. United States, 505 U.S. 144, 112 S.Ct. 2408 (1992), the Court invalidated under the Tenth Amendment portions of a federal law concerning disposal of radioactive waste. The origin of that case may be traced to Congress having reacted to a shortage of suitable radioactive waste disposal sites by passing the Low-Level Radioactive Waste Policy Amendments Act of 1985. The 1985 statute imposed responsibility on the states to dispose of waste within their borders, including a requirement that states "take title" to waste not disposed of as of 1996 and that these states would be liable for damages incurred by their failure to take possession of that waste. Id. at 153-54, 112 S.Ct. at 2416. The Court held that the "take title" provisions of the law were unconstitutional because by forcing states to take ownership of the waste the law impermissibly would "commandeer" state governments contrary to the Tenth Amendment. The Court

45

believed that this attempted exercise of federal power exceeded Congress's powers under Article I of the Constitution. In reaching its result the Court stated that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program," id. at 188, 112 S.Ct. at 2435, because doing so would limit state government accountability, as state governments forced to implement a federal program would be held responsible for decisions they did not make.

The Supreme Court in New York v. United States rejected the reasoning of Darby and, rather than regarding the Tenth Amendment as a mere tautology as it had done in Darby, "direct[ed] [courts] to determine . . . whether an incident of state sovereignty is protected by a limitation on [congressional] power." Id. at 157, 112 S.Ct. at 2418. As in New York v. United States, the States in this case claim that Congress is asserting a power that it does not have — a de facto federal escheat power — that is an affront to a state sovereign prerogative: to take custody to property it deems "unclaimed" or "abandoned" within its borders.

Of course, a court makes a different analysis when determining if it has jurisdiction over a claim than it makes when considering the merits of the claim. As the Supreme Court has stated, "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89, 118 S.Ct. 1003, 1010 (1998) (internal quotation marks

46

and citation omitted).  While, as we discuss below, we do not find that the States' Tenth Amendment claim is meritorious, in light of developing Tenth Amendment law the claim surely is colorable and not frivolous.  Accordingly, the District Court had jurisdiction because "[it] is firmly established . . . that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case."  Id.

Inasmuch as the District Court had jurisdiction under 28 U.S.C. § 1331 over the States' Tenth Amendment claim, by reason of 28 U.S.C. § 1367 it had jurisdiction over the States' entire complaint.  Section 1367 provides, with inapplicable exceptions, if "the district courts have original jurisdiction, [they] shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Here it is clear that all of the States' claims are related to their claim under the Tenth Amendment.  In this regard, we point out that in the introduction to their complaint the States assert that "Treasury's refusal to comply with state laws governing unclaimed property usurps sovereign power exercised by the states since the Declaration of Independence, and reserved to the states under the Tenth Amendment of the U.S. Constitution."  App. at 88.

The Supreme Court in City of Chicago v. International College of Surgeons, 522 U.S. 156, 164-65, 118 S.Ct. 523, 529 (1997), indicated that a district court may exercise supplemental jurisdiction if the case before it involves claims "derive[d] from a common nucleus of operative fact such that the relationship

47

between the federal claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional claim." (internal quotation marks and brackets omitted). This case fits within that criterion because the States in this action have a single goal, i.e., to obtain a judgment requiring that the Government remit to them and account for the proceeds of matured but unredeemed savings bonds.[24]

---

[24] The States also assert that the Mandamus and Venue Act, 28 U.S.C. § 1361, and 28 U.S.C. § 1346 (containing the Little Tucker Act and the Federal Tort Claims Act), provide for federal jurisdiction here but we do not decide whether either statute would confer jurisdiction in light of our conclusion that the District Court had jurisdiction by reason of the States' Tenth Amendment claim under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

Though we do not predicate our result on this point we note that if the District Court could not exercise jurisdiction in this case it well may be that there would not be any court in which plaintiff States could have brought their claims against the Federal Defendants under their unclaimed property acts. After all, the New Jersey state courts are well aware that section 702 "does not waive sovereign immunity in actions in a state court" and thus they would not entertain an action seeking an order enjoining the Securities and Exchange Commission from prosecuting an administrative complaint against the plaintiff in the state court action. First Jersey Secs., Inc. v. Sec. Exch. Comm'n, 476 A.2d 861, 867-68 (N.J. Super. Ct. App. Div.

B.     State-Law Claims and the Supremacy Clause

Inasmuch as we have determined that sovereign immunity does not bar this action and that the District Court had constitutional and statutory jurisdiction we finally reach the substantive aspects of the case. We start this discussion by recognizing that although this case is essentially a dispute over the application of federal law, the States' claims arise from their attempt to enforce their unclaimed property acts against the Federal Government. The Government asserts that these claims run afoul of the Supremacy Clause of the Constitution in art. VI, cl. 2, which provides that the Constitution and laws in pursuance of it "shall be the supreme Law of the Land." State laws may violate the Supremacy Clause in two ways. Under the doctrine of federal preemption, state laws are invalid if they "conflict with an affirmative command of Congress." North Dakota v United States, 495 U.S. 423, 434, 110 S.Ct. 1986, 1994 (1990) (citing Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824)). And under the doctrine of intergovernmental immunity, states may not "regulate the Government directly or

---

1984). In view of First Jersey Securities we see no reason to believe that even without regard for federal court intervention through the exercise of removal jurisdiction or Supreme Court appellate review, the New Jersey courts would have entertained this action if the State of New Jersey had initiated the case in the New Jersey Superior Court and named the Federal Defendants as defendants. Of course, a result that the States did not have any forum in which to bring their claims surely would have been inconsistent with the intent of Congress in adopting the 1976 APA amendments.

discriminate against it."   North Dakota, 495 U.S. at 434, 110 S.Ct. at 1994 (citing McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 425-37, 4 L.Ed. 579 (1819)).

### 1.    Federal Preemption

Federal preemption doctrine "provid[es] Congress with the power to preempt state legislation if it so intends." Roth v. Norfalco LLC, 651 F.3d 367, 374 (3d Cir. 2011) (internal quotation marks and citation omitted).   There are three types of preemption:   express preemption and two types of implied preemption, field preemption and conflict preemption. Farina v. Nokia Inc., 625 F.3d 97, 115 (3d Cir. 2010) (citing Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 2375 (1985)).   There is express preemption when a federal enactment contains language that is explicit about its preemptive effect.   See St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the V.I., 218 F.3d 232, 238 (3d Cir. 2000). There is field preemption when Congress has regulated an area so pervasively that it has not left room for state regulation. See United States v. Locke, 529 U.S. 89, 111, 120 S.Ct. 1135, 1149 (2000).   There is conflict preemption when compliance with both state and federal law is impossible, "or where state law erects an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Farina, 625 F.3d at 115 (internal quotation marks omitted).   Moreover, "[w]here Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive effect than federal statutes." Fellner v. Tri-Union Seafoods, LLC, 539 F.3d 237, 243 (3d Cir. 2008).   Although courts define the

50

categories of preemption separately the categories are not "rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent . . . to exclude state regulation." English v. Gen. Elec. Co., 496 U.S. 72, 79 n.5, 110 S.Ct. 2270, 2275 n.5 (1990).

There are two guiding principles of preemption jurisprudence. "'First, the purpose of Congress is the ultimate touchstone in every pre-emption case.'" Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 1194 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 2259 (1996)). Second, we are guided by a "presumption against preemption," Roth, 651 F.3d at 375 (citing Deweese v. Nat'l R.R. Passenger Corp., 590 F.3d 239, 246 (3d Cir. 2009)), because we assume "that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Levine, 555 U.S. at 565, 129 S.Ct. at 1194-95 (quoting Lohr, 518 U.S. at 485, 116 S.Ct. at 2250) (internal quotation marks omitted). However, the presumption against preemption does not apply where Congress has adopted the statute claimed to have preemptive effect to apply in a field that "the States have [not] traditionally occupied." Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347-48, 121 S.Ct. 1012, 1017 (2001) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947)).

We agree with the District Court that the federal statutes and regulations pertaining to United States savings bonds preempt the States' unclaimed property acts insofar as the States

51

seek to apply their acts to take custody of the proceeds of the matured but unredeemed savings bonds. In reaching this conclusion we recognize that there is no federal statute or regulation that expressly preempts the application of the States' unclaimed property acts in the way that the States seek to enforce them in this litigation. But it is equally important to recognize that "[f]ederal law of course governs the interpretation of the nature of the rights and obligations created by the Government bonds themselves." Free, 369 U.S. at 669-70, 82 S.Ct. at 1094 (quoting Bank of Am. Trust & Savs. Ass'n v. Parnell, 352 U.S. 29, 34, 77 S.Ct. 119, 122 (1956)). Thus, in Free a surviving husband filed an action against a beneficiary of his wife's will to determine the parties' rights in United States savings bonds that the husband and wife purchased together. The Supreme Court held that Texas law providing that the savings bonds were community property was inconsistent with federal regulations that provide that when either co-owner dies, "the survivor will be recognized as the sole and absolute owner [of the bonds] and thus the federal regulation preempted the Texas law." Id. at 664-65, 82 S.Ct. at 1091 (quoting 31 C.F.R. § 315.61). While in the case before us the conflict between state and federal law is less stark, we similarly hold that the relevant federal statutes and regulations preempt the States' unclaimed property acts.

The States' unclaimed property acts conflict with federal law regarding United States savings bonds in multiple ways. First, in advancing the goal of making the bonds "attractive to savers and investors," see Free, 369 U.S. at 669, 82 S.Ct. at 1093, Congress has authorized the Secretary to implement regulations specifying that "owners of savings bonds may keep

52

the bonds after maturity." 31 U.S.C. § 3105(b)(2)(A).[25]  The plaintiff States' unclaimed property acts, by contrast, specify that matured bonds are abandoned and their proceeds are subject to the acts if not redeemed within a time period as short as one year after maturity.  See, e.g., N.J. Stat. Ann. § 46:30B-41.2. Such provisions starkly conflict with savings bonds regulations imposing "conditions governing their redemption." 31 U.S.C. § 3105(c)(4); see 31 C.F.R. § 315.5(a) (providing that the registered owner of the bond is presumed conclusively to be the owner); § 315.15 (providing that savings bonds are "payable only to the owners named on the bonds, except as specifically provided in these regulations and then only in the manner and to the extent so provided."); § 315.20(b) (providing that the Department of the Treasury will recognize a claim of ownership or interest in a bond only if "established by valid, judicial proceedings"); § 315.35(a) (providing that payment may be made only to persons entitled to it under the regulations); § 315.39 (providing that the owner of the bond may present it to an authorized paying agent for redemption).

The States assert that the "restrictions on 'payment' in these regulations foreclose only redemption of bonds by persons who are not owners, not application of historic laws governing disposition of property not redeemed by its owner." Appellants' br. at 29.   In other words, the States argue that because they

---

[25] The Secretary effectively has allowed owners of savings bonds to keep them after maturity and to earn interest after maturity because the Treasury has extended the bonds' original maturity dates and interest accrues during the extension period. See supra note 3.

seek only custody of the bond proceeds, their unclaimed property acts will not interfere directly with federal contracts or the regulations regarding redemption. However, those regulations conflict with the outcome that the States seek here. Most critically, application of the States' unclaimed property acts would interfere with the terms of the contracts between the United States and the owners of the bonds because, according to the States' complaint, they effectively would substitute the respective States for the United States as the obligor on affected savings bonds. See app. at 99 (asserting that "delivery of an Unclaimed Bond to a State . . . will discharge the Treasury from its obligation under the bond," such that the bond owners may "claim their property from the state"). As the Government points out, the bonds are pledged "on the credit of the United States," U.S. Const. art. I, § 8, cl. 2, and not on the credit of any individual state. Both bondholders and the United States, who bargained for a federal redemption process that the Federal Government set forth in detail in the relevant statutes and regulations, instead would have to comply with procedures set forth in the various States' unclaimed property acts, thus "intrud[ing] upon the rights and the duties of the United States." See Free, 369 U.S. at 669, 82 S.Ct. at 1094. The federal regulations regarding redemption effectively would be nullified.

This change in redemption procedures if the States obtain custody of the proceeds of the matured but unredeemed bonds might not be a small thing from the point of view of an owner of a bond seeking to redeem it. As we explained above, redemption of a matured savings bond is now an uncomplicated process involving little more than a trip to a bank, a venue likely to be familiar to the owner of the bond, with the bondholder

54

dealing with a bank employee with whom he already may be acquainted. On the other hand, though it is possible that the States would designate the same payment agents as the Government now designates if the States obtained custody of the proceeds of the bonds, an owner seeking those funds would have to navigate whatever procedures the States adopted for the owner to receive the funds and those procedures could be more complex than those presently in place under federal law. Moreover, a bondholder's effort to recover the funds in a State's custody might require the bondowner to deal with what almost certainly would be an unfamiliar state bureaucracy. We simply do not know.

The Government also has expressed concerns that a substitution of the plaintiff States as obligors on the bonds could result in the United States being subject to multiple obligations on a single savings bond. Thus, the Government fears that bondholders still would have a contractual right to payment from the United States based on the terms of the bonds even though the various state unclaimed property acts would give bondholders the right to recover the proceeds of property deemed "abandoned" or "unclaimed" from the States. Although the States have indicated that they would indemnify the Federal Government if it was required to make payments on matured bonds to bondholders after the Government delivered the proceeds of the bonds to the States pursuant to their unclaimed property acts, the possible availability of indemnification does not change the fact that application of the States' acts in the redemption process significantly would alter that process as

contemplated in the relevant federal regulations.[26]

The States note that the federal statutes and regulations implementing the savings bond program do not include provisions for the disposition of abandoned property, and thus they argue that federal law leaves room for the operation of their unclaimed property acts in this field. However, the bond proceeds are not "abandoned" or "unclaimed" under federal law because the owners of the bonds may redeem them at any time after they mature, and thus Congress has not been silent with respect to the fate of the proceeds of unclaimed bonds. The States' efforts to impose the status of "abandoned" or "unclaimed" on the Federal Government's obligations only underscores the conflict between federal and state law, in which federal law must prevail. There simply is no escape from the fact that the Federal Government does not regard matured but unredeemed bonds as abandoned even in situations in which a state would do exactly that. Of course, in a preemption analysis

---

[26] We are not predicating our result on a conclusion that honoring a custody-based unclaimed property act might subject the United States to multiple liabilities on a single bond. We decline to speculate on what would happen if a bondholder sought to redeem a bond by presenting it to a Government payment agent and requesting that he be paid the proceeds if the Government already had delivered the proceeds of the bond to a State pursuant to its unclaimed property act. That situation is not before us and, in any event, even disregarding the possibility that the Government might face multiple liabilities on a single bond by complying with a State's unclaimed property act, the States' unclaimed property acts are preempted.

the distinction between the custody of the proceeds of the bonds or physical custody of the bonds themselves is without legal significance. The States seek the transfer of $1.6 billion of federally-held funds to their treasuries together with a substantial realignment of the obligations that the bonds evidence and the procedures for redemption that federal laws and regulations have established. It is clear to us that the federal statutes and regulations are sufficiently pervasive so as not to leave room for the enforcement of the unclaimed property acts to achieve the result that the States seek.

## 2. Intergovernmental Immunity

The Supreme Court's decision in McCulloch, 17 U.S. (4 Wheat.) at 322, established the bedrock principle that "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the national government." Thus, that famous decision is the source of the doctrine of intergovernmental immunity. We agree with the District Court that the States' desired application of their unclaimed property acts would violate the constitutional principles of intergovernmental immunity that "states may not directly regulate the federal government's operations or property." See Arizona v. Bowsher, 935 F.2d 332, 334 (D.C. Cir. 1991) (citing Hancock v. Train, 426 U.S. 167, 178-80, 96 S.Ct. 2006, 2012-13 (1976)).

First, in this regard, the unclaimed property acts would interfere with Congress's "[p]ower to dispose of and make all

57

needful Rules Acts and Regulations respecting the . . . Property belonging to the United States." See U.S. Const. art. IV, § 3, cl. 2. On this point, the States argue that the United States no longer has a beneficial interest in the undisbursed proceeds from the matured but unredeemed bonds. But we disagree. In support of their position, the States cite United States v. Klein, 303 U.S. 276, 58 S.Ct. 536 (1938), in which the Escheator of the Commonwealth of Pennsylvania sought to recover funds that a private company owed its bondholders pursuant to a judgment entered by a federal district court. Unclaimed funds were paid into a court registry and later transferred to the United States Treasury under 28 U.S.C. § 852, which at that time provided that when money deposited into the registry of a federal court was unclaimed for five years, it would be deposited with the Treasury, and further provided that "[a]ny person or persons . . . entitled to any such money may . . . obtain an order of court directing payment of such money to the claimant." The Supreme Court in holding that the State of Pennsylvania could acquire title to unclaimed funds through valid escheat proceedings observed that the United States held the funds for a limited administrative purpose, and did not assert "any right, title or interest" in the funds. 303 U.S. at 280, 58 S.Ct. at 538. Further, 28 U.S.C. § 852 "contemplate[d] that changes in ownership of the fund may occur, since it provides that after the right to the fund has been finally adjudicated and it has been covered into the Treasury it shall be paid over to any person entitled, upon full proof of his right to receive it." Id. at 282, 58 S.Ct. at 539.

The plaintiff States also rely on In re Moneys Deposited, 243 F.2d 443 (3d Cir. 1957), where we addressed the status of

private funds that were not claimed in bankruptcy proceedings and thus were transferred to the United States Treasury for administrative purposes under 28 U.S.C. § 2042, the successor legislation to the statute in issue in Klein. Following Klein, this Court held that Pennsylvania could obtain title to the funds through escheat proceedings because, as in Klein, the United States did not have a beneficial interest in the money deposited in the federal registry. In this case, in contrast to how it obtained the funds in issue in both Klein and Moneys Deposited, the United States did not acquire the funds due on matured but unredeemed bonds through the exercise of an administrative function. Quite to the contrary, the Government acquired the funds from its sale of savings bonds for its own use. Thus, unlike the claimants in Klein and Moneys Deposited, the States here do not seek funds due on privately undertaken obligations, as in Klein, or seek funds in which the Government as custodian never had a property interest as was true in both Klein and Money Deposited. Rather, the States seek to acquire funds that have their origin in debt that the United States incurred to finance the operations of the Government.

As did the District Court, we find Bowsher to be persuasive on this point. In Bowsher, 23 states sued the Comptroller General of the United States and the Secretary claiming the right to custody pursuant to their respective unclaimed property acts of money held by the Treasury pursuant to 31 U.S.C. § 1322, which granted the Treasury custody of money that federal agencies owed to persons whose whereabouts were unknown. 935 F.2d at 334. Like the plaintiff States in this case, the plaintiffs in Bowsher argued that they wanted to return the unclaimed property to its true owners, but

59

the court observed that "[w]hen the United States sets aside money for the payment of specific debts, it does not thereby lose its property interest in that money." Id. The court further stated:

> The money here is federal money. That various persons have claims against the United States in amounts exactly matching the funds, and intended by Congress to be paid from these funds, does not give those individuals a property interest in the money. Thus, the states' plan would amount to direct regulation of federal property. In extracting funds from the Treasury, the states would effectively subordinate federal property to their own laws and appropriate that property, at least for a period, for themselves.

Id. Accordingly, the court held that the states' plan to take custody of the money violated the doctrine of intergovernmental immunity.

We recognize that the States argue that their unclaimed property acts come, in the words of Bowsher, "with a patina of ancient history," see id. at 335, and that there is a presumption against preemption of laws of such origin. Nevertheless, we see no reason to reach a different result here from that reached in Bowsher. Although the United States must pay holders of matured bonds the sums due on the bonds when the owners present them for payment, until it does so the funds remain federal property, and the Government may use the proceeds from the sale of savings bonds "for expenditures authorized by [federal] law," 31 U.S.C. § 3105(a).

60

The States argue that instead of following Bowsher we should be guided by the Supreme Court's analysis in Connecticut Mutual Life, 333 U.S. at 547, 68 S.Ct. at 686, where the Court held that the State of New York could apply its unclaimed property act to life insurance policies that out-of-state insurers had issued. In rejecting the insurance company's argument in Moore that the state law violated the Contract Clause, the Court noted that "[t]he state is acting as a conservator, not as a party to a contract." Id. Moreover, the Court recognized that New York's conservatorship of insurance money was possible because "[f]oreign corporations must obtain state authority to do business, segregate securities, [and] submit to examination and state process." Id. at 550-51, 68 S.Ct. at 668. But states' extensive regulatory powers over corporations operating within their borders, in light of McCulloch, do not and could not have a counterpart in their relationships with the Federal Government, and consequently Connecticut Mutual Life is inapposite here.

For similar reasons, we hold that an order compelling the accounting that the plaintiff States request would violate the governmental immunity of the United States. As the District Court observed, the States' unclaimed property acts impose "onerous record-keeping and reporting requirements, [and] civil and criminal penalties for failure to comply." App. at 29; see, e.g., 72 Pa. Cons. Stat. § 1301.11 (describing reporting requirements); § 1301.25 (failure to comply with reporting requirements a criminal offense subject to fine and imprisonment); N.J. Stat. Ann. § 46:30B-93 (subjecting holders of unclaimed property to examination of records by the state administrator); Mont. Code Ann. § 70-9-824 (providing for

61

financial penalties against holders of unclaimed property who fail to report and deliver property to the state administrator). Although the States argue that they only seek relief requiring the Federal Government to comply with generally applicable laws, several of the States have enacted provisions in their unclaimed property acts specifically addressed to property within the possession of the Federal Government. See N.J. Stat. Ann. § 46:30B-41.2 (providing that property where the obligor is a branch of the United States government is presumed abandoned after one year); Ky. Rev. Stat. Ann. § 393.068 ("[a]ll . . . personal property . . . held by the federal government . . . shall be presumed abandoned if remained unclaimed for five years); Mo. Rev. Stat. § 447.532 (property held by an agency of the United States deemed abandoned if unclaimed for three years); 72 Pa. Cons. Stat. § 1301.9 (property held for its owner by any "instrumentality of the United States" unclaimed for five years deemed abandoned).

When Congress was considering legislation in the late 1980s that would have required the Federal Government to transfer unclaimed money obtained from various sources — including savings bonds — to the states, the General Accounting Office estimated that tracking owners of such property would cost over $23 million.[27] See app. at 185. Although the States assert that they will not seek to enforce civil and criminal penalties in the event the Federal Government fails to comply with their respective acts, even if future State officials adhere to this policy, the fact remains that forcing the Federal Government

---

[27] We are not drawing any inference with respect to the issues in this case from the fact that Congress did not adopt that bill.

to account to the plaintiff States for unredeemed savings bonds or their proceeds — regardless of how stringently the States decide to enforce the reporting requirements contained in their respective acts — would result in a direct regulation of the Federal Government in contravention of the Supremacy Clause. This result is not permissible.

C.     The Tenth Amendment

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The States argue that the status quo amounts to a federal escheat of the proceeds from the unclaimed bonds, a process which they contend violates the Tenth Amendment because the Federal Government does not possess the escheat power, as it is a traditional prerogative of the states. However, the funds at issue here have not been escheated to the Government and the Government does not seek to acquire them through escheat proceedings. To the contrary the Government is holding the funds and will disburse them to the bondholders or their successors if they present the bonds for redemption. Moreover, our result does not nullify state escheat laws for, as provided in the federal regulations and as recognized by the Treasury, third parties, including the States, may obtain ownership of the bonds — and consequently the right to redemption — through "valid[] judicial proceedings," 31 C.F.R. § 315.20(b), so long as they submit certified copies of the judgment or order affecting ownership and other evidence that may be necessary to support the validity of the judgment or order. See 31 C.F.R. § 315.23. The Government through its

63

issuance of the Escheat Decision admits as much. Here, however, the States merely seek custody of, not title to, the funds at issue under their unclaimed property acts.[28]

In considering the States' Tenth Amendment contentions it is important to remember that the Government administers the savings bond program pursuant to the federal constitutional power "[t]o borrow money on the credit of the United States." Free, 369 U.S. at 666-67, 82 S.Ct. at 1092. Pursuant to this power, 31 U.S.C. § 3105(b)(2)(A) authorizes the Secretary of the Treasury to "prescribe regulations providing that . . . owners of savings bonds may keep the bonds after maturity or after a period beyond maturity." "If Congress acts under one of its

---

[28] We hasten to add that while in concluding that the State custody-based unclaimed property acts are preempted we are distinguishing, as does the Government itself, those acts from title-based acts, we do not imply that our result would be different if, confronted with a judgment of escheat under a title-based escheat act, the Government abandoned its long held position as reflected in the Escheat Decision and refused to recognize the enforceability of the judgment with respect to savings bonds or their proceeds. We simply are not faced with that possibility and thus we do not address it. We merely are ruling on the basis of the legal picture as the Government presently sees it. Furthermore, we neither are agreeing nor disagreeing with the States with respect to their contention that the Federal Government does not have escheat power. We see no need to pass on this contention as the Federal Government is not seeking to escheat the proceeds of matured but unredeemed bonds.

enumerated powers . . . there can be no violation of the Tenth Amendment." United States v. Parker, 108 F.3d 28, 31 (3d Cir. 1997) (quoting United States v. Mussari, 95 F.3d 787, 791 (9th Cir. 1996)). Accordingly, the States' Tenth Amendment claim must fail.

## V. CONCLUSION

Though the United States pursuant to 5 U.S.C. § 702 has waived its sovereign immunity from suit in this case, we do not find any merit in any of the States' claims. Therefore, we will affirm the District Court's February 5, 2010 order dismissing the action under Rule 12(b)(6).