**Affirmed in part, Reversed and Remanded in part; Opinion Filed December 30, 2020**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-19-01192-CV**
_____

**THE ESTATE OF LEAH RITA TILLOTSON, DECEASED**

**On Appeal from the County Court at Law No. 2**
**Hunt County, Texas**
**Trial Court Cause No. 18359**

## MEMORANDUM OPINION

Before Justices Schenck, Osborne, and Partida-Kipness
Opinion by Justice Partida-Kipness

In this probate proceeding, Thomas Tillotson appeals the trial court's order approving the inventory, appraisement, and list of claims filed by the administratrix of his wife's estate. In five issues, Thomas contends the trial court erred in overruling his objections to the administratrix's claims to a community interest in his Rollover IRA, Roth IRA, and U.S. savings bonds, and for reimbursement related to a down payment made on the community residence and funds used to benefit Thomas's separate real property. We reverse and remand in part and affirm in part.

## BACKGROUND

Thomas and decedent Leah Rita Tillotson were married in 1980. Leah died intestate on August 31, 2017. Kristi Sherrill Hoyl, one of Leah's daughters from a previous marriage, was appointed administratrix of Leah's estate.

Hoyl filed an initial and amended inventory, appraisement, and list of claims with the trial court. Thomas objected to the amended inventory, appraisement, and list of claims. Specifically, Thomas objected that Hoyl had included among the estate's community property inventory Thomas's Rollover IRA, Roth IRA, and U.S. savings bonds. He argued that any community property interest the estate had in these items was preempted by federal law that established the investments and rendered them his separate property. Thomas also objected to two items listed among the claims owed to the estate: reimbursement to the estate of $25,000 in Leah's separate property used as down payment to purchase the couple's home in 1984; and community funds allegedly used to pay mortgage, taxes, and insurance on Thomas's separate real property. According to Thomas, the $25,000 down payment came from community funds, and the estate actually benefited from rent on his separate real property. The trial court heard and overruled Thomas's objections. This appeal followed.

## STANDARD OF REVIEW

Any interested person who considers an inventory, appraisement, or list of claims to be erroneous, unjust, or missing property or claims may file a written

–2–

complaint to compel the personal representative to appear and show cause why the alleged error should not be corrected. TEX. EST. CODE §§ 309.102(a), 309.103(a). A trial court shall conduct a hearing, and if the court is satisfied that the evidence has proven that property or claims have been omitted or that the inventory, appraisement, or list of claims is erroneous, the court shall enter an order addressing the corrections. TEX. EST. CODE §§ 309.102(b) (requiring the personal representative to file "an additional inventory and appraisement or list of claims, of both, as applicable"), 309.103(b) (the trial court's order shall specify "the erroneous or unjust item and the corrections to be made").

We review a trial court's order on a complaint under sections 309.102 and 309.103 for an abuse of discretion. *See In re Estate of Walker*, 250 S.W.3d 212, 214 (Tex. App.—Dallas 2008, pet. denied) (reviewing an order under predecessor section 258 of the probate code for an abuse of discretion); *In re Estate of Denton*, No. 11-10-00341-CV, 2012 WL 3063845, at *4 (Tex. App.—Eastland July 26, 2012, no pet.) (mem. op.) (reviewing an order approving an amended inventory under section 255 of the probate code, predecessor to section 309.054 of the estates code, for an abuse of discretion). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *In re Estate of Walker*, 250 S.W.3d at 214 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

## ANALYSIS

In five issues, Thomas contends the trial court erred in overruling his objections and approving Hoyl's amended inventory, appraisement, and list of claims.

## A.    Thomas's Rollover and Roth IRAs

In his first and second issues, Thomas contends the trial court erred in approving Hoyl's inventory and appraisement to include his Rollover IRA and Roth IRA among the estate's community property interests.  Hoyl's amended inventory lists two IRAs:

- Institution: Fidelity
  Account type: Rollover IRA
  Account/CD No: XXXXX0935
  Total value of asset: $1,305,906.86
  Less surviving spouse share: $652,953.40
  Co-owners: Tom Tillotson and Leah Rita Tillotson
  Decedent's interest: 1/2 community property

- Institution: Fidelity
  Account type: Roth IRA
  Account/CD No: XXXXX8220
  Total value of asset: $22,599.96
  Less surviving spouse share: $11,299.98
  Co-owners: Tom Tillotson and Leah Rita Tillotson
  Decedent's interest: 1/2 community interest.

According to Thomas, the federal law that created these IRAs for the exclusive benefit of the individual investor or his beneficiaries preempts state law that would treat them as community property.  Hoyl contends the funds in both IRAs were earned during Thomas and Leah's marriage, and there is no legal authority

–4–

supporting Thomas's position. Although Thomas admits the IRAs were funded with community property, he maintains any community property rights under state law are federally preempted by Sections 408 and 408A of the Internal Revenue Code.

Section 408(a) defines "individual retirement account" as "a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries." 26 U.S.C. § 408(a) (2019). Section 408(g) states, "This section shall be applied without regard to any community property laws." 26 U.S.C. § 408(g). Section 408A(a) states that "[e]xcept as provided in this section, a Roth IRA shall be treated for purposes of this title in the same manner as an individual retirement plan." 26 U.S.C. § 408A(a). According to Thomas, these provisions are sufficient to preempt Texas community property law because state law conflicts with section 408(a)'s intent that his IRAs were created for his and his beneficiaries' "exclusive benefit." *See Hyundai Motor Co. v. Alvarado*, 974 S.W.2d 1, 4 (Tex. 1998) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981), and holding, "A state law is preempted and 'without effect' if it conflicts with federal law"). Consequently, Thomas argues the estate could not hold a community interest in the IRAs. Thomas cites no case law to support this proposition.

Hoyl, however, cites *United States v. Berry*, CR H-17-385, 2018 WL 6602184, at *1 (S.D. Tex. Dec. 17, 2018), *supplemented*, H-17-385, 2019 WL 545334 (S.D. Tex. Jan. 17, 2019), for the proposition that section 408 does not

abrogate substantive rights under state law. Although only persuasive, we find *Berry* helpful to our analysis.

*Berry* concerned Gwendolyn Berry's conviction and imprisonment for wire fraud, mail fraud, and making a false tax return. *Id.* The conviction required Gwendolyn to pay restitution, and the government filed an application for writ of garnishment from five retirement accounts. *Id.* Gwendolyn was married to Michael Berry, and the requested garnishment would include 50% of Michael's investment in two IRAs on the grounds that the funds were Michael's solely managed community property. *Id.* The Berrys moved to quash the application on various grounds, including conflict-preemption of the state-law characterization of the IRAs. *Id.*

The trial court noted that "[t]he disputed accounts are comprised of funds that were once regulated by ERISA and are now regulated by Section 408 of the Tax Code." *Id.* The Berrys argued that "[l]ike ERISA as construed in [*Boggs v. Boggs*, 520 U.S. 833 (1997)], the federal law which is § 408 renders state efforts to categorize retirement funds as separate, community or anything else meaningless." *Id.* The court noted, however, "There is no federal case, involving an IRA rollover, that holds that some federal law, other than ERISA, preempts state community property law." *Id.* at *2. The court also cited IRS private letter ruling 1999-37-055 in which the IRS ruled that § 408(g) "does not abrogate any substantive rights under State law." *Id.* (citing I.R.S. Priv. Ltr. Rul. 199937055 (Sept. 17, 1999)). The court

noted that "[t]he IRS explained that § 408(g) only applies to sections 219 and 220, as such, the classification of an IRA rollover as community property was a matter of state law." *Id.* Thus, the court held that section 408 does not preempt state community property law. *Id.* After Hoyl filed her brief here, the Fifth Circuit issued its opinion affirming the trial court's ruling in *Berry*. *United States v. Berry*, 951 F.3d 632, 636 (5th Cir. 2020).

Thomas argues that *Berry* is inapplicable here because it does not address section 408(a), which states that IRAs are created "for the exclusive benefit of an individual or his beneficiaries." *See* 26 U.S.C. § 408(a). We disagree. By denying the Berrys' motion to quash, the *Berry* court effectively held not only that section 408(g) did not abrogate state community property law, but also that an IRA could contain community property. Were it to have held otherwise, it could not have permitted the garnishment. This holding is also consistent with the I.R.S. private letter ruling cited by the *Berry* court. In that letter ruling, the I.R.S. ruled that funds invested in an IRA may be classified as marital property, subject state community property laws. I.R.S. Priv. Ltr. Rul. 199937055 (Sept. 17, 1999). Although *Berry* concerned the application of state community property law in the context of criminal restitution, Thomas has not provided, and we are not aware of, any authority suggesting that *Berry*'s reasoning should not apply here.

Thomas also argues that tax implications associated with the withdrawal of IRA funds further demonstrate that state law is preempted. According to Thomas,

he will incur the tax liability on a forced distribution of IRA funds to the estate, and this "is an outcome that § 408 is, in part, intended to avoid." Again, Thomas cites no authority supporting this argument. However, as Hoyl points out, the United States Tax Court has recognized that an IRA may contain community funds, which have no effect on the tax liability at distribution. *See Bunney v. C.I.R.*, 114 T.C. 259, 261–64 (2000) ("[S]ection 402(g) precludes taxation of petitioner's former spouse as a distributee in recognition of her State community property interest in petitioner's IRA's. Accordingly, the distributions from petitioner's IRA's are wholly taxable to petitioner."). In other words, the tax liability on IRA distributions has no effect on the community classification of the funds invested in the IRA. Having determined that Thomas did not establish federal preemption, we conclude the trial court did not abuse its discretion in approving Hoyl's inventory as to the Rollover and Roth IRAs. We overrule Thomas's first and second issues.

**B.    Thomas's U.S. savings bonds**

In his third issue, Thomas contends the trial court erred in approving Hoyl's community property inventory to include U.S. savings bonds issued solely in his name. Hoyl's amended inventory lists among the estate's community property interests:

> BONDS - various instruments: $70,665.36
> Decedent's interest: 1/2 community property.

The record reflects that these are series "EE" and "I" U.S. savings bonds purchased by Thomas between 1990 and 2008, while he was married to Leah. Like the IRAs,

–8–

Hoyl contends the bonds were purchased with community property and are, therefore, part of the estate. Thomas, however, maintains that federal regulations controlling bond ownership established his right of survivorship and his resulting sole ownership of the bonds at Leah's death. Thomas argues these regulations preempt the conflicting community property law on which Hoyl relies.

The bonds at issue are considered "beneficiary bonds" because they are registered to one individual, "Thomas C Tillotson," and include a payable-on-death designation, "POD Leah R Tillotson. *See* 31 C.F.R. §§ 353.7(a)(3) (2020) ("Beneficiary form. A bond may be registered in the name of one individual payable on death to another. 'Payable on death to' may be abbreviated to 'P.O.D.'"), 360.6(a)(3) (2020) (same).[1] Sections 353.70 and 360.70 establish the rules governing "ownership or entitlement" to payment or bond reissue when certain persons named on a beneficiary bond have died. 31 C.F.R. §§ 353.70 (2020), 360.70 (2020). For a beneficiary bond, "[i]f the beneficiary's death occurs before, or simultaneously with, that of the registered owner, payment or reissue will be made as though the bond were registered in the owner's name alone." 31 C.F.R §§ 353.70(c)(2), 360.70(c)(2). Additionally, sections 353.20 and 360.20 declare that "[t]he Department of the Treasury will not recognize . . . a judicial determination

---

[1] Part 353 of Treasury Department regulations governs series "EE" bonds, and part 360 governs series "I" bonds.

that impairs the rights of survivorship conferred by the regulations in this part upon a co[-]owner or beneficiary." 31 C.F.R. §§ 353.20(a), 360.20(a).

According to Thomas, these sections establish his right of survivorship in the bonds and preempt conflicting Texas law on which Hoyl relies to establish the estate's community property interest in the bonds. At the outset, however, we note that sections 353.20(a) and 360.20(a) protect "rights of survivorship conferred by the regulations in this part upon a co[-]owner or beneficiary." 31 C.F.R. §§ 353.20(a), 360.20(a). Yet, the record reflects that Thomas was neither a "co[-]owner or beneficiary" of the bonds before Leah's death. As such, we conclude those provisions are inapplicable here.

Additionally, Thomas did not offer evidence, argument, or authority to show that his interest in the bonds qualified as a survivorship interest. A right of survivorship provides the holder with a right to receive a property interest held by another party upon that party's death. *See Mims-Brown v. Brown*, 428 S.W.3d 366, 373 (Tex. App.—Dallas 2014, no pet.) ("All that is required to make an interest 'survive' to another party is a word or phrase expressing that the interest of the deceased party will survive to the surviving party."); *see, e.g.*, TEX. EST. CODE § 113.052 ("On the death of the party, ownership of the account passes to the P.O.D. beneficiaries of the account."). As confirmed by Treasury regulations, a beneficiary does not have title to the bond, but merely a vested, defeasible interest. 31 C.F.R. §§ 353.47(c) (2020) (permitting the owner of beneficiary bonds to "substitute

–10–

another individual as beneficiary" or "eliminate the beneficiary"), 360.47(c) (2020) (same); *see also Edds v. Mitchell*, 184 S.W.2d 823, 830 (Tex. 1945) (holding a bond beneficiary has only a vested, defeasible interest, not title).

Instead, Thomas argues his right of survivorship arises from sections 353.70 and 360.70, which terminate a predeceased beneficiary's interest and convert the beneficiary bond into a single-owner bond. *See* 31 C.F.R §§ 353.70(c)(2), 360.70(c)(2). We note, however, that the subsections on which Thomas relies do not refer to the remaining interest as a survivorship. 31 C.F.R §§ 353.70(c)(2), 360.70(c)(2). In contrast, other inapplicable subsections do characterize the remaining interest as a survivorship. *See* 31 C.F.R §§ 353.70(b)(1) (death of one co-owner), 360.70(b)(1) (same), 353.70(c)(1) (death of the owner of a beneficiary bond), 360.70(c)(1) (same). Indeed, it is an illogical conclusion that the owner of a property interest could have a right of survivorship in a beneficiary's interest in the same property. He would be surviving to his own interest. Accordingly, we conclude that Thomas could not hold a right of survivorship in Leah's beneficiary interest.

This determination, however, does not resolve the issue. We must also determine whether the Treasury regulations specifying ownership of the beneficiary bonds preempt conflicting Texas law.

Thomas also cites *Free v. Bland*, 369 U.S. 663 (1962), to support his contention that federal regulations establish his survivorship right and preempt

–11–

conflicting Texas law. Hoyl contends that *Free* concerns only savings bond survivorship provisions and does not support Thomas's preemption argument. As we have established, however, Thomas did not have a survivorship right in Leah's beneficiary interest. Regardless, the Supreme Court's holding in *Free* is not as limited as Hoyl contends and establishes that federal regulations preempt any state law that frustrates the nature of the rights and obligations created by the bonds themselves.

J.W. and Mary Free were a married couple living in Texas. *Free*, 369 U.S. at 664. Mary had a son, James Bland, by a previous marriage. *Id*. When Mary died, a controversy arose between J.W. and Bland regarding U.S. savings bonds purchased by J.W. during the marriage. *Id*. at 664–65. The bonds were registered to "'Mr. or Mrs.' Free." *Id*. at 665. Bland was the principal beneficiary under Mary's will and claimed a community-property interest in the bonds. *Id*. J.W. claimed exclusive ownership under federal savings bond regulations. *Id*. at 664–65 (quoting 31 C.F.R. § 315.61 [recodified at 31 C.F.R. § 315.70(b)(1) (2020)]).

The trial court awarded J.W. full title to the bonds based on the federal regulations but awarded reimbursement to Bland based on Texas community property laws. *Id*. at 665. The court of appeals affirmed the award of title but reversed the reimbursement award. *Id*. The Texas Supreme Court reversed the court of appeals and reinstated the trial court's judgment, relying on its opinion in *Hilley v. Hilley*, 342 S.W.2d 565, 570 (1961), issued while the appeal was pending,

–12–

rejecting the argument that federal savings bond regulations governing survivorship preempt conflicting state law. *Id*. at 665–66.

The United States Supreme Court granted certiorari and reversed the Texas Supreme Court. *Id*. at 671. The Supreme Court upheld the preemptive power of the federal regulations at issue and rejected the argument that the regulations were intended merely to provide a convenient method of payment. *Id*. at 667–68. The Court further noted that "[t]he success of the management of the national debt depends to a significant measure upon the success of the sales of the savings bonds." *Id*. at 669. Thus, "[t]he Treasury is authorized to make the bonds attractive to savers and investors." *Id*. Survivorship provisions are one such inducement. *Id*. Thus, the Court held that state law requiring the holder of a survivorship interest to reimburse the estate of the deceased co-owner as a matter of law, "interfer[es] directly with a legitimate exercise of the power of the Federal Government to borrow money." *Id*. More broadly, the Court held, "Federal law of course governs the interpretation of the nature of the rights and obligations created by the Government bonds themselves." *Id*. at 669–70 (quoting *Bank of Am. Nat. Tr. & Sav. Ass'n v. Parnell*, 352 U.S. 29, 34 (1956)).

Although the survivorship provision is not an issue here, the principle identified by the Court still applies. Namely, that state law cannot interfere with the nature of rights and obligations created by the bonds themselves. *See id*.; *see also Laturner v. United States*, 933 F.3d 1354, 1363 (Fed. Cir. 2019), *cert. denied*, 19-

1279, 2020 WL 5882248 (U.S. Oct. 5, 2020) (holding state escheat laws setting deadline for bond redemption preempted by federal regulations permitting retention without limitation); *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 407 (3d Cir. 2012) (citing *Free* and holding federal regulations preempt seven states' attempt to recover proceeds from matured but unredeemed U.S. savings bonds). Federal regulations controlling bond registration state that "registration is conclusive of ownership," except for reissue to correct error. 31 C.F.R. §§ 353.5(a) (2020), 360.5(a) (2020). "[S]uch regulations are dispositive on the issue of ownership and thus pre-empt state law." *In re Mears*, 94-60902, 1995 WL 81936, at *2 (Bankr. N.D. Ohio Feb. 13, 1995) (citing *Free*).

Here, Thomas is listed as the sole owner of the bonds. Federal regulations mandate that "payment or reissue will be made as though the bond were registered in the owner's name alone." 31 C.F.R §§ 353.70(c)(2), 360.70(c)(2). These regulations preempt conflicting state law. *See Free*, 369 U.S. at 669–70.

Hoyl points out that the Supreme Court recognized in *Free* that preemption could not be used as "a shield for fraud and relief would be available in a case where the circumstances manifest fraud or a breach of trust tantamount thereto on the part of a husband while acting in his capacity as manager of the general community property." *Id*. The Court addressed fraud in *Yiatchos v. Yiatchos*, 376 U.S. 306, 307 (1964), cited by Hoyl for the proposition that "short of providing for a survivorship

–14–

or co-ownership issuance of the bonds, federal law should not permit relief which would constitute [Thomas's] breach of trust over the community assets."

*Yiatchos* concerned a non-spouse beneficiary's survivorship interest in savings bonds purchased with community property. *Id*. at 308. The issue on appeal was whether the bond purchase was fraud as a matter of law such that state law controlled the disposition of the bonds. *Id*. at 308–09. The Court noted that the state law at issue allowed spouses to change the status of community property by agreement or gift. *Id*. at 309. There was no evidence the surviving spouse agreed or consented to a gift of the community property used in the purchase. *Id*. However, the parties had stipulated to the facts before the Court had issued its opinion in *Free*. *Id*. at 310. Thus, the Court reversed state supreme court's judgment that the bond purchase was void and remanded the case to prove facts regarding the surviving spouse's knowledge or participation in the purchase. *Id*.

Hoyl, like the respondent in *Yiatchos*, made no claim of fraud. However, unlike the respondent in *Yiatchos*, Hoyl had access to the Supreme Court's opinion in *Free*, upholding and limiting the Treasury regulations' preemptive power to prevent fraud. Indeed, Hoyl cited *Yiatchos* and *Free* in her response to Thomas's motion for summary judgment, arguing, as she does here, that "federal law should not permit relief which would constitute [Thomas's] breach of trust over the community assets." Yet, Hoyl offered no evidence or argument at the hearing on Thomas's objections to show that he had committed fraud. Thus, Hoyl failed to

claim and prove fraud, and merely purchasing beneficiary bonds with community property is not fraud as a matter of law. *See id.* at 312.

Having determined that federal regulations controlling ownership and entitlement to payment of the beneficiary bonds at issue preempt conflicting state law applied by the trial court, we sustain Thomas's third issue.

## C. Down Payment Reimbursement

In his fourth issue, Thomas contends the trial court erred in approving Hoyl's claim for reimbursement of Leah's separate property used for a down payment on the family home in 1984.

"Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." TEX. FAM. CODE § 3.003(a). "The degree of proof necessary to establish that property is separate property is clear and convincing evidence." *Id.* § 3.003(b). Thus, a party asserting separate property has the burden of rebutting the community property presumption by clear and convincing evidence. *Chavez v. Chavez*, 269 S.W.3d 763, 767 (Tex. App.—Dallas 2008, no pet.). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

Although the testimony of a spouse seeking to overcome the community-property presumption need not be corroborated to meet the clear and convincing standard, a party's unsupported and contradicted testimony may not meet the clear

–16–

and convincing standard. *Pace v. Pace*, 160 S.W.3d 706, 714 (Tex. App.—Dallas 2005, pet. denied). Thus, to rebut the community-property presumption, the contesting party must generally trace and clearly identify property claimed as separate property. *Chavez*, 269 S.W.3d at 767. "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* Mere testimony that property was purchased with separate property funds, without tracing the funds, is generally insufficient to rebut the presumption. *Id.* "Any doubt as to the character of property should be resolved in favor of the community estate." *Id.*

The record reflects that Thomas and Leah built a house on River Oaks in 1984 (River Oaks House). They paid either $25,000, $33,000, or $45,000 as a down payment and financed the remaining balance, approximately $185,000. Hoyl's list of claims includes a claim for $25,000 of Leah's separate property used for the down payment. Evidence regarding the source of the down payment is conflicting.

In a deposition taken before the hearing on Thomas's objections, Thomas testified that the money came from the sale of a house owned by Leah (Windy Hill House). The parties do not dispute that the Windy Hill House was Leah's separate property bought before the marriage. At the hearing, however, Thomas testified that the proceeds from the sale of the Windy Hill House did not go directly into the down

payment for the River Oaks House.[2]  Rather, the proceeds were deposited into a community bank account, and the down payment was drawn from this account. Thomas also testified that he could not tell how much Leah received from the sale of the Windy Hill House "because it was an assumable loan and [he did not] know the difference between the sales amount and the loan amount." Yet, Thomas claimed the proceeds were combined with a "pretty big tax refund" to make the down payment. Thomas testified at various points that both the tax refund and the sale proceeds were either $33,000 or $25,000.

At the hearing, Hoyl testified that Leah told her that she sold the Windy Hill House to make the down payment on the River Oaks House. Thomas objected to the testimony as hearsay, and the trial court overruled the objection. According to Hoyl, Leah "was very proud of being able to . . . put the down payment on the River Oaks home." Contrary to Thomas's testimony, Hoyl said that Leah indicated the down payment was $45,000. Hoyl also admitted that the proceeds from the sale of the Windy Hill House went into a community bank account. She did not know how long the money was in the account before the down payment was made on the River Oaks House or what other funds were put into the account.

---

[2] Thomas acknowledged that his hearing testimony differed from his deposition testimony. According to Thomas, however, he was merely correcting his prior testimony, which was based on his imperfect recollection of events that occurred thirty-five years prior.

Although the testimony regarding the source and amount of the down payment on the River Oaks House varied, both parties testified that the proceeds from the sale of the Windy Hill House went into a community bank account before the down payment was made. Thus, Leah's separate property in the proceeds was commingled with community property.

Commingled separate funds do not lose their identity as separate property if they may be traced. *Beal Bank v. Gilbert*, 417 S.W.3d 704, 709 (Tex. App.—Dallas 2013, no pet.). However, if separate and community property have been so commingled as to defy resegregation and identification, the commingled property is presumed to be community property. *Id.* Additionally, when separate and community funds are commingled in a single bank account, we presume the community funds are drawn out before separate funds. *Zagorski v. Zagorski*, 116 S.W.3d 309, 319–20 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

As the party contesting the community-property presumption, Hoyl had the burden to prove by clear and convincing evidence that the $25,000 down payment came from Leah's separate property. *See Chavez*, 269 S.W.3d at 767. Hoyl's own testimony proved the proceeds at issue were deposited into a community bank account before the down payment was made, which gave rise to a further presumption that the down payment was made from community property. *See Beal Bank*, 417 S.W.3d at 709; *Zagorski*, 116 S.W.3d at 319–20. Hoyl did not offer any evidence to trace Leah's separate funds after they were commingled. *See Beal Bank*,

417 S.W.3d at 709. Indeed, Hoyl testified only that she did not know how long the funds were in the community bank account before the down payment was made. Further, the evidence offered did not clearly establish the exact amount of the down payment. *See Chavez*, 269 S.W.3d at 767 (requiring clear identification of property claimed as separate property). Accordingly, we conclude that Hoyl failed to overcome the community-property presumption, and the trial court abused its discretion in approving Hoyl's claim for reimbursement of the $25,000 down payment. We sustain Thomas's fourth issue.

**D.    Reimbursement of Community Property Expended on Thomas's Separate Property**

In his fifth issue, Thomas contends the trial court erred in approving Hoyl's claim for reimbursement of community property expended on Thomas's separate real property.

A claim for reimbursement includes "payment by one marital estate of the unsecured liabilities of another marital estate" and "the reduction of the principal amount of a debt secured by a lien on property owned before marriage, to the extent the debt existed at the time of marriage." TEX. FAM. CODE § 3.402(a)(1), (3); *Hinton v. Burns*, 433 S.W.3d 189, 195 (Tex. App.—Dallas 2014, no pet.). "A right of reimbursement arises when the funds or assets of one estate are used to benefit and enhance another estate without itself receiving some benefit." *Hinton*, 433 S.W.3d at 195. The party claiming the right of reimbursement has the burden to plead and prove the expenditures and improvements were made and are reimbursable. *Id.* A

trial court must resolve a claim for reimbursement by using equitable principles. *Id.*; *see also* TEX. FAM. CODE § 3.402(b) (courts shall resolve claims for reimbursement by using equitable principles). A court has broad discretion in evaluating a reimbursement claim. *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988) (discretion is as broad as that "exercised by the trial court in making a 'just and right' division of the community property").

When evaluating such a claim, the fact finder must offset the enhancement value to the benefitted estate against any benefits returned to the paying estate. *See Penick*, 783 S.W.2d at 197–98. "The party seeking an offset to a claim for reimbursement has the burden of proof with respect to the offset." TEX. FAM. CODE § 3.402(e).

The record reflects that Thomas and Leah owned separate houses when they married in 1980. Thomas retained his house (Bonnie View House) after the couple were married and moved into the Windy Hill House. Eventually, Thomas and Leah built and relocated to the River Oaks House. During the course of the marriage, community funds were used to pay ad valorem taxes, insurance, and the mortgage on the Bonnie View House. Thus, Hoyl asserts a claim for reimbursement of the community property expended on the Bonnie View House. Specifically, Hoyl claims:

Community interest in reimbursement
for investment in Separate Property real property
(2308 Bonnie View) owned by Tom Tillotson to wit:
66 payments x 163.98, mortgage = $10,822.68,
Ad Valorem Taxes 1995-2017 = $55,986.31,
31 payments x 212.00 = $6,752.00 insurance on house.
Total claim $73,380.99. Decedent's estate community
reimbursement 1/2 =                                                    $36,690.50.

The record reflects that the only evidence regarding community property expended on the Bonnie View House came in the form of Hoyl's and Thomas's testimony. Specifically, Hoyl testified that sixty-six mortgage payments were made on the Bonnie View House: $163 per month. Thomas acknowledged the mortgage payments were made from community funds. Hoyl also testified that the community estate paid ad valorem taxes on the property between 1995 and 2017, totaling $55,986.31. She claimed the community estate had paid taxes back to 1980, but she could not obtain records from before 1995. Thomas also acknowledged these payments but claimed they "came out of rent," referring to rental income generated by the property. Hoyl testified that thirty-one insurance payments were made from the community estate, totaling $6,752. Thomas testified that the insurance was also paid from rental proceeds. According to Thomas, the property generated rental income and provided personal tax advantages to himself and Leah through interest, tax, and insurance deductions. Regarding the rental income, Thomas testified, "[F]or the last eleven years, I looked at the rental net gain and over the last eleven years, 2007 to 2017, we averaged $257 a month gain." He did not specify how this

"gain" was calculated or whether included the personal tax advantages he mentioned.

The trial court acknowledged the testimony in open court, specifically noting the rental income and the need to "take that into account in splitting the difference in the reimbursement." The trial court stated:

> So what I did was and it's not exact, but it is as good as we're going to get here. I gave him credit for [the rental income] and put it toward the amounts toward the mortgage, which paid off the mortgage, actually, if you take the sixty-six payments, which I'm sure it wasn't all there, but we cannot specifically grant how many times and how many months it was rented. So I just gave him credit for all sixty-six months.
>
> ***
>
> The total claim would be 5,600 – 4 – $418. Her half would be $28,209.

Thomas contends that the trial court misconstrued his testimony regarding the rental income, treating it as rent received versus a net gain. Thomas, however, does not direct the Court to the record demonstrating his objection to the trial court's error. From our review of the record, it does not appear that Thomas raised an objection so as to preserve this error for our review. *See* TEX. R. APP. P. 33.1(a). Regardless, Thomas's testimony did not indicate how the "gain" was calculated or whether it was received during the time the payments at issue were being made, but merely that it was received from 2007 to 2017. Thomas bought the Bonnie View House in 1966, and he and Leah were married from 1980 to 2017. The record reflects that the trial court received what evidence the parties provided, which consisted solely of testimony, and balanced the benefit to the community estate

–23–

against the payments made by the community estate.  *See Penick*, 783 S.W.2d at 197–98.  Accordingly, we conclude the trial court did not abuse its discretion and we overrule Thomas's fifth issue.

## CONCLUSION

We conclude that the trial court abused its discretion in approving Hoyl's inventory to include Thomas's U.S. savings bonds among the estate's share of community property and in approving Hoyl's claim for reimbursement of $25,000 of Leah's separate property used for a down payment on the River Oaks House. Accordingly, we sustain Thomas's third and fourth issues and reverse the trial court's order as to these issues.  We affirm the trial court's order as to all remaining issues and remand this case for further proceedings consistent with this opinion.


/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

191192F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THE ESTATE OF LEAH RITA TILLOTSON, DECEASED

No. 05-19-01192-CV

On Appeal from the County Court at Law No. 2, Hunt County, Texas
Trial Court Cause No. 18359.
Opinion delivered by Justice Partida-Kipness. Justices Schenck and Osborne participating.

In accordance with this Court's opinion of this date, the order of the trial court approving the estate administratrix's Amended Inventory, Appraisement and List of Claims is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** those portions of the trial court's order approving the estate's inventory to include U.S. savings bonds owned by Thomas Tillotson among the estate's share of community property and the estate's claim for reimbursement of $25,000 of decedent's separate property used for a down payment on the River Oaks House. In all other respects, the trial court's order is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 30th day of December, 2020.